# Huber *versus* Reily.

1. The Act of Congress of March 3d 1865 imposes forfeiture of citizenship and its rights, as an additional penalty for the crime of desertion; it is therefore highly penal and must receive a strict construction in favor of the citizen.

2. Every new refusal of a drafted man to render service, is a public offence, for which Congress may impose a penalty, and the Act of 1865 is not *ex post facto*.

3. The power to determine who shall or shall not be a voter in a state belongs to the state itself, and the Constitution of the United States gives Congress no power to prescribe the qualifications of electors in the states.

4. Congress may deprive a citizen of the opportunity to enjoy a right belonging to him as a citizen of a state, even the right of voting, but cannot deprive him of the right itself.

5. Congress may as a penalty, impose upon a criminal, forfeiture of his citizenship of the United States, and if the constitution of a state allows only citizens of the United States to vote, Congress may thus affect the number of voters.

6. The Act of Congress of 1865 is not an attempt to prescribe the qualifications of voters in a state; it merely punishes the offender for violating the federal law, by depriving him of his citizenship of the United States.

7. "Due process of law" ordinarily includes a complainant, a defendant, and a judge, regular allegations, opportunity to answer, and a trial according to some settled course of proceeding.

8. A judge of election or board of election officers are not a judicial tribunal to ascertain the guilt of a public offender, and a trial before such officers is not "due process of law."

9. It is not "due process of law," where the judgment is not final, and leaves the accused exposed to another trial in another tribunal.

10. The Act of 1865 is one of a series of acts respecting the crime of desertion, and must be interpreted with them all in view.

11. The Acts of Congress relating to desertion all contemplate a regular trial and conviction prior to inflicting a penalty, and courts-martial are constituted for such trials.

12. The 21st section of the Act of 1865 refers to pre-existing laws relating to desertion, with the single object of increasing the penalties, but does not change or dispense with the machinery for punishing the crime. It is to be read as if incorporated into the former acts.

13. The forfeiture prescribed must be *adjudged* to the convicted person, after trial by a court-martial and sentence approved.

14. A citizen drafted into the service of the United States, who had notice but refused to report and was registered as a deserter, under the Acts of Congress, is nevertheless entitled to vote, unless he has been convicted of desertion by a court-martial.

ERROR to the Court of Common Pleas of *Franklin county*.

This was an action on the case, commenced October 11th 1865, by Henry Reily against Benjamin Huber, in which the following case stated was afterwards filed:—

"It is admitted that Henry Reily (the plaintiff) was a citizen of the township of Hamilton, in the county of Franklin, and was liable to military service in the army of the United States. That on the 19th day of July, A. D. 1864, he was regularly drafted into the military service of the United States to fill the quota of the township of Hamilton, under a then pending requisition of the

President of the United States for troops.   It is further admitted that he was regularly served with a copy of the draft notice, but that he refused to report, and never did report at the head-quarters of the provost-marshal of the sixteenth district of Pennsylvania, including among others the county of Franklin, for muster into the army of the United States.   That he never furnished a substitute, or paid the required sum therefor.   It is admitted that the plaintiff never did enter into the military service of the government.   It is further admitted that the plaintiff was registered by the provost-marshal of the district as a deserter from the military service of the United States, upon the records of his office, at Chambersburg.

" It is further admitted that the plaintiff was a qualified elector of the township of Hamilton aforesaid, under the constitution and laws of Pennsylvania: that the defendant was judge of the general election held in and for the township of Hamilton aforesaid, on the 10th day of October, A. D. 1865 : that the plaintiff on said day tendered his ballot to the board of election officers of said township, and that the defendant, acting as a judge of said election, refused to receive said ballot on the ground that the plaintiff was a deserter from the military service of the United States, and in consequence thereof was disfranchised by the Act of Congress, approved the 3d day of March, A. D. 1865, entitled ' An act to amend the several acts heretofore passed to provide for the enrolling and calling out the national forces and for other purposes.'

" It is further admitted that if the plaintiff was a qualified elector of this Commonwealth, and had a right to vote, notwithstanding anything contained in the said Act of Congress, that then the plaintiff has a right to recover in this action, and it is agreed that his damages shall be assessed at $1."

The court below entered judgment for the plaintiff, which was assigned for error.

*McClure & Stewart*, and *Stambaugh & Gehr*, for plaintiff in error, took the following positions :—

1. That the plaintiff in error, in rejecting the defendant's ballot, acted in accordance with the provisions of the Act of Congress, approved March 3d 1865.   And,

2. That this act is constitutional in its provisions.

On the 1st point they cited Acts of Congress of March 3d 1865, § 21, and March 3d 1863, § 13 ; Const. of Penna., art. 3, § 1 ; Lynch v. Clark, 1 Sandf. R. 583 ; Scott v. Sandford, 19 How. 533.

On the 2d point they cited Act of Congress of March 3d 1863 ; Kneedler v. Lane, 9 Wright 295, Vattel 106 ; Calder v. Bull, 3 Dall. 386 ; Murray v. Hoboken Land Co., 18 How. 281, 282.

3 P. F  SMITH—8

[Huber *v.* Reily.]

*F. M. Kimmell, George W. Brewer, Wm. S. Stenger* and *J. McD. Sharpe,* for defendant in error, made the following points :—

1. It is incompetent for Congress, under the Federal Constitution, to impair either directly or indirectly the right of suffrage in the states.

2. The Act of Congress of the 3d of March 1865, is an *ex post facto* law, and therefore violates the Federal Constitution.

3. The act proposes to inflict and impose pains and penalties upon offenders before and without a trial and conviction *by due process of law,* and therefore is in direct antagonism to the Bill of Rights.

They cited, on the 1st point, Const. of U. S., arts. 9 and 10 ; Commonwealth *v.* Hartman, 5 Harris 119.

On the 2d point, Calder *v.* Bull, 3 Dall. 386.

On the 3d point, Const. U. S., Amendments, art. 5 ; Brown *v.* Hummel, 6 Barr 91.

The opinion of the court was delivered, July 20th 1866, by

Strong, J.—The Act of Congress under which the defendant below justifies his refusal to receive the vote of the plaintiff is the one approved on the 3d day of March 1865. The 21st section is the only one applicable to this case, and it is as follows : " And be it further enacted, that in addition to the other lawful penalties of the crime of desertion from the military or naval service, all persons who have deserted the military or naval service of the United States, who shall not return to said service, or report themselves to a provost-marshal within sixty days after the proclamation hereafter mentioned, shall be deemed and taken to have voluntarily relinquished and forfeited their rights of citizenship and their rights to become citizens ; and such deserters shall be for ever incapable of holding any office of trust or profit under the United States, or of exercising any right of citizens thereof ; and all persons who shall hereafter desert the military or naval service, and all persons who being duly enrolled, shall depart the jurisdiction of the district in which he is enrolled, or go beyond the limits of the United States, with intent to avoid any draft into the military or naval service, duly ordered, shall be liable to the penalties of this section." This is followed by a clause authorizing and requiring the President to issue his proclamation setting forth the provisions of the section, and we know judicially that this was done on the 11th of March 1865.

The Act of Congress is highly penal. It imposes forfeiture of citizenship and deprivation of the rights of citizenship as penalties for the commission of a crime. Its avowed purpose is to add to the penalties which the law had previously affixed to the offence of desertion from the military or naval service of the United States, and it denominates the additional sanctions pro-

vided as penalties. Such being its character, it is, under the well-known rule of law, to receive a strict construction in favor of the citizen.

The constitutionality of the act has been assailed on three grounds. The first of these is that it is an *ex post facto* law, imposing an additional punishment for an offence committed before its passage, and altering the rules of evidence so as to require different and less proof of guilt than was required at the time of the perpetration of the crime. The second objection is that the act is an attempt by Congress to regulate the right of suffrage in the states, or to impair it, and the third objection is that the act proposes to inflict pains and penalties upon offenders before and without a trial and conviction by due process of law, and that it is therefore prohibited by the Bill of Rights.

In the view which we take of this case, and giving to the enactment the construction which we think properly belongs to it, it is unnecessary to consider, at length, either of these objections to its constitutionality. It may be insisted with strong reason that the penalty of forfeiture of citizenship imposed upon those who had deserted the military or naval service prior to the passage of the act is not a penalty for the original desertion, but for persistence in the crime, for failure (in the language of the statute) to return to said service, or to report to a provost-marshal within sixty days after the issue of the President's proclamation. If this is so, the Act of Congress is in no sense *ex post facto*, and it is not, for that reason, in conflict with the constitution. Its operation is entirely prospective. If a drafted man owes service to the Federal Government, every new refusal to render the service may be regarded as a violation of public duty, a public offence for which Congress may impose a penalty. And as it is the duty of every court to construe a statute, if possible, so " *ut res magis valeat, quam pereat,*" that construction of this act must be adopted which is in harmony with the acknowledged powers of Congress, and which applies the forfeiture of citizenship to the new offence described as failure to return to service, or to report to the provost-marshal.

The second objection also assumes more than can be conceded. It is not to be doubted that the power to regulate suffrage in a state, and to determine who shall or who shall not be a voter, belongs exclusively to the state itself. The Constitution of the United States confers no authority upon Congress to prescribe the qualifications of electors within the several states that compose the Federal Union. Congress is indeed empowered to make regulations for the time, place and manner of holding elections for senators and representatives, or to alter those made by the legislature of a state (except those in relation to the places of choosing senators), but here its power stops. The right of suffrage

[Huber *v.* Reily.]

at a state election is a state right, a franchise conferrable only by the state, which Congress can neither give nor take away. If, therefore, the act now under consideration is in truth an attempt to regulate the right of suffrage in the state, or to prescribe the conditions upon which that right may be exercised, it must be held unwarranted by the constitution. In the exercise of its admitted powers, Congress may doubtless deprive an individual of the opportunity to enjoy a right that belongs to him as a citizen of a state, even the right of suffrage. But this is a different thing from taking away or impairing the right itself. Under the laws of the Federal Government a voter may be sent abroad in the military service of the country, and thus deprived of the privilege of exercising his right; or a voter may be imprisoned for a crime against the United States, but it is a perversion of language to call this impairing his right of suffrage. Congress may provide laws for the naturalization of aliens, or it may refuse to provide such laws. Its action or non-action may thus determine whether individuals shall or shall not become citizens of the United States. And I cannot doubt that as a penalty for crime against the General Government, Congress may impose upon the criminal forfeiture of his citizenship of the United States. Disfranchisement of a citizen as a punishment for crime is no unusual punishment: Barker *v.* The People, 20 Johns. 458. If by the organic law of a state citizens of the United States only are allowed to vote, the action or non-action of Congress may thus indirectly affect the number of those entitled to the right of suffrage. Yet, after all, the right is one which its possessor holds as a citizen of a state, secured to him by the state constitution, and to be held on the terms prescribed by that constitution alone.

But it is not a correct view of the Act of Congress now before us to regard it as an attempt to override state constitutions or to prescribe the qualifications of voters. The act makes no change in the organic law of the state. It leaves that, as before, to confer the right of suffrage as it pleases. The enactment operates upon an individual offender, punishes him for violation of the Federal law by deprivation of his citizenship of the United States, but it leaves each state to determine for itself whether such an individual may be a voter. It does no more than increase the penalties of the law upon the commission of crime. Each state defines for itself what shall be the consequence of the infliction of such penalties. And with us, it is still our own constitution which restricts the right of suffrage and confers it upon those only who are inhabitants of the state and citizens of the United States.

The third objection against the validity of the Act of Congress would be a very grave one if the act does in reality impose pains

[Huber *v*. Reily.]

and penalties before and without a conviction by due process of law. The fifth article of the amendments to the constitution ordains "that no person shall be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger, nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb ; nor shall he be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law."

The sixth article secures to the accused in all criminal prosecutions certain rights, among which are a speedy and public trial by a jury of the vicinage, information of the nature and cause of the accusation, face to face presence with the witnesses against him, compulsory process for his own witnesses and the assistance of counsel. The spirit of these constitutional provisions is briefly that no person can be made to suffer for a criminal offence unless the penalty be inflicted by due process of law. What that is, has been often defined, but never better than it was, both historically and critically, by Judge Curtis, of the Supreme Court of the United States, in Den *v*. Murray *et al.*, 18 Howard 272. It ordinarily implies and includes a complainant, a defendant and a judge, regular allegations, opportunity to answer and a trial according to some settled course of judicial proceeding. It must be admitted there are a few exceptional cases. Prominent among these are summary proceedings to recover debts due to the government, especially taxes and sums due by defaulting public officers. But I can call to mind no instance in which it has been held that the ascertainment of guilt of a public offence and the imposition of legal penalties, can be in any other mode than by trial according to the law of the land or due process of law, that is, the law of the particular case, administered by a judicial tribunal authorized to adjudicate upon it. And I cannot persuade myself that a judge of elections or a board of election officers constituted under state laws is such a tribunal. I cannot think they have power to try criminal offenders, still less to adjudge the guilt or innocence of an alleged violator of the laws of the United States. A trial before such officers is not due process of law for the punishment of offences according to the meaning of that phrase in the constitution. There are, it is true, many things which they may determine, such as the age and residence of a person offering to vote, whether he has paid taxes, and whether, if born an alien, he has a certificate of naturalization. These things pertain to the ascertainment of a political right. But whether he has been guilty of a criminal offence, and has, as a consequence, forfeited his right, is an inquiry of a different character. Neither our constitution or our law has conferred upon the judges of elections

[Huber *v.* Reily.]

any such judicial functions. They are not sworn to try issues in criminal cases. They have no power to compel the attendance of witnesses, and their judgment, if rendered, would be binding upon no other tribunal. Even if they were to assume jurisdiction of the offence described in the Act of Congress, and proceed to try whether the applicant for a vote had been duly enrolled and drafted, whether he had received notice of the draft, whether he had deserted and failed to return to service or failed to report to a provost-marshal, and whether he had justifying reasons for such failure, and if after such trial they were to decide that he had not forfeited his citizenship, all this would not amount to an acquittal. It would not protect him against a subsequent similar accusation and trial, would not protect him against trial and punishment by a court-martial. Surely that is no trial by due process of law, the judgment in which is not final, decides nothing, but leaves the accused exposed to another trial in a different tribunal, and to the imposition by that other tribunal of the full punishment prescribed by law. Moreover, it is not in the power of Congress to confer upon such a tribunal, which is exclusively of state creation, jurisdiction to try offences against the United States. Notwithstanding the decision in Buckwalter *v.* The United States, 11 S. & R. 193, which was an action for penalties declared to be recoverable as other debts, the doctrine seems a plain one that Congress cannot vest any of the judicial power of the United States in the courts of any other government or sovereignty: Martin *v.* Hunter's Lessee, 1 Wheat. 304, 330; Ely *v.* Peck, 7 Conn. 242, and Scoville *v.* Canfield, 14 Johns. 338. And clearly, if this is so, Congress cannot make a board of state election officers competent to try whether a person has been guilty of an offence against the United States, and if they find him guilty to enforce a part of the prescribed penalty.

If, therefore, the Act of March 3d 1865 really contemplates the infliction of its prescribed penalty, or any part of it, without due process of law, or if it attempts to confer upon the election officers of a state the power to determine whether there has been a violation of the act incurring the penalty, and to enforce the penalty or any part of it, it may well be doubted whether it is not transgressive of the authority vested in Congress by the constitution.

But such is not the fair construction of the enactment. It is not to be presumed that Congress intended to transgress its powers, and especially is this true when the act admits of another construction entirely consonant with all the provisions of the constitution.

What, then, is its true meaning? As already observed, forfeiture of citizenship is prescribed as a penalty for desertion, an additional penalty, not for an offence committed before the passage

[Huber v. Reily.]

of the act, but for continued desertion, and failure to return or report. It is not a new consequence of a penalty, but it is an integral part of the thing itself. Nor is it the whole. It is added to what the law had previously enacted to be the penalty of desertion, as imprisonment is sometimes added to punishment by fine. It must have been intended, therefore, that it should be incurred in the same way, and imposed by the same tribunal that was authorized to impose the other penalties for the offence. It would be very absurd to suppose that two trials and two condemnations for one crime were intended, or that it was designed that a criminal might be sentenced in one court to undergo a part of the punishment denounced by the law, and be punished in another court by the imposition of the remainder.

The law, as it stood when the Act of 1865 was passed, had provided a tribunal in which alone the crime of desertion could be tried, and by which alone the penalties for desertion could be inflicted. The consequences of conviction may be noticed in other courts, but the tribunal appointed by the law for that purpose is the only one that can determine whether the crime has been committed, and adjudge the punishment.

The Act of March 3d 1865 is not to be considered apart from the other legislation respecting the crime of desertion. It is one of a series of acts pertaining to the same subject-matter. It must therefore be interpreted with them all in view. This is an admitted rule of statutory construction. So long ago as Rex v. Loxdale, 1 Burrows 147, Lord Mansfield said, when speaking of Acts of Parliament, " that all which relate to the same subject, notwithstanding some of them may be expired or not noticed, must be taken to be one system, and construed consistently." So Chancellor Kent, in the first volume of his Commentaries 463–4, said : " It is to be inferred that a code of statutes relating to one subject was governed by one spirit and policy, and was intended to be consistent and harmonious in its several parts and provisions." In looking through the numerous Acts of Congress relating to desertion from the military or naval service, it is plainly to be seen that they all contemplate a regular trial and conviction prior to the infliction of any penalty, and courts-martial are constituted and regulated for such trials. The 20th article of war, enacted on the 10th of April 1806, Brightly's Dig. 75, is in these words: " All officers and soldiers who have received pay, or have been duly enlisted in the service of the United States, and *shall be convicted* of having deserted the same, shall · suffer death, or such other punishment as *by sentence of court-martial* shall be inflicted." Other enactments have been made at different times respecting the punishments to be inflicted for the offence. The punishment of death in time of peace was abolished in 1830. Corporal punishment by stripes was abolished

[Huber *v.* Reily.]

by the Act of May 16th 1812, and by the Act of March 2d 1833 that section of the repealing act was itself repealed, " so far as it applies to any enlisted soldiers *who shall be convicted by a general court-martial of the crime of desertion.*" By the Act of January 11th 1812, an additional penalty was prescribed for desertion, and it was declared that such soldier " shall and may be tried by a court-martial and punished :" Brightly's Dig. 89.. The 13th section of the Act of March 3d 1863, which declared that any person failing to report, after due service of notice that he had been drafted, shall be deemed a deserter, enacted that such a person " shall be arrested by the provost-marshal, and sent to the nearest military post *for trial by court-martial,* unless upon proper showing that he is not liable to military duty, the board of enrolment shall relieve him from the draft." All these Acts of Congress manifestly contemplate trial for desertion in courts-martial, and the infliction of no punishment or forfeiture, except upon conviction and sentence in such courts. The Act of 1806 provided for general courts-martial, and made minute and careful regulations for their organization, for the conduct of their proceedings, and for the approval or disapproval of their sentences. Subsequent acts made some changes, but they have not restrained the jurisdiction, or diminished the powers of such courts. It is to such a code of laws, forming a system devised for the punishment of desertion, that the 21st section of the Act of March 3d 1865 was added. It refers plainly to pre-existing laws. It has the single object of increasing the penalties, but it does not undertake to change or dispense with the machinery provided for punishing the crime. The common rules of construction demand that it be read as if it had been incorporated into the former acts. And if it had been, if the Act of 1806 and its supplements had prescribed that the penalty for desertion, or failure to report within a designated time after notice of draft (which the Act of 1863 declares desertion), should be punished on conviction of the same, with forfeiture of citizenship and death, or in lieu of the latter, such other punishment as by the sentence of a court-martial may be inflicted, would any one contend that any portion of this punishment could be inflicted without conviction and sentence ? Assuredly not. And if not, so must the Act of 1865 be construed now. It means that the forfeiture which it prescribes, like all other penalties for desertion, must be *adjudged* to the convicted person, after trial by a court-martial, and sentence approved. For the conviction and sentence of such a court there can be no substitute. They alone establish the guilt of the accused, and fasten upon him the legal consequences. Such, we think, is the true meaning of the act, a construction that cannot be denied to it without losing sight of all the previous legislation respecting the same subject-matter, no part of which does this act profess to alter.

[Huber *v.* Reily.]

It may be added that this construction is not only required by the universally admitted rules of statutory interpretation, but it is in harmony with the personal rights secured by the constitution, and which Congress must be presumed to have kept in view. It gives to the accused a trial before sworn judges, a right to challenge, an opportunity of defence, the privilege of hearing the witnesses against him, and of calling witnesses in his behalf. It preserves to him the common-law presumption of innocence until he has been adjudged guilty according to the forms of law. It gives finality to a single trial. If tried by a court-martial and acquitted, his innocence can never again be called in question, and he can be made to suffer no part of the penalties prescribed for guilt. On the other hand, if a record of conviction by a lawful court be not a prerequisite to suffering the penalty of the law, the Act of Congress may work intolerable hardships. The accused will then be obliged to prove his innocence whenever the registry of the provost-marshal is adduced against him. No decision of a board of election officers will protect him against the necessity of renewing his defence at every subsequent election, and each time with increased difficulty arising from the possible death or absence of witnesses. In many cases this may prove a gross wrong. It cannot be doubted that in some instances there were causes that prevented a return to service, or a report by persons registered as deserters by provost-marshals, that would have been held justifying reasons by a court-martial, or at least would have prevented an approval of the court's sentence. It is well known, also, that some who were registered deserters were at the time actually in the military service as volunteers, and honorably discharging their duties to the government. To hold that the Act of Congress imposes upon such the necessity of proving their innocence without any conviction of guilt, would be an unreasonable construction of the act, and would be attributing to the national legislature an intention not warranted by the language and connection of the enactment.

It follows that the judgment of the court below, upon the case stated, was right. The plaintiff not having been convicted of desertion and failure to return to the service, or to report to a provost-marshal, and not having been sentenced to the penalties and forfeitures of the law, was entitled to vote.

　　　　　　　　　　　　　The judgment is affirmed.

WOODWARD, C. J.—I concur in the conclusion stated in the above opinion, and in most of the reasonings by which that conclusion is reached.

But I do not concur in treating the Act of Congress as a valid enactment, for I believe it to be an *ex post facto* law, in respect to all soldiers except such as commit the crime of desertion *after*

[Huber *v.* Reily.]

the date of the law. This is not a case of desertion subsequent to the enactment, but prior to it, and the penalties of the offence are such as were fixed by law when the offence was committed, and it is not competent for the legislature to increase them except for future cases.

READ, J., and AGNEW, J., dissented, and filed dissenting opinions.