TROP *v.* DULLES, SECRETARY OF STATE, ET AL.

No. 70.   Argued May 2, 1957.—Restored to the calendar for reargument June 24, 1957.—Reargued October 28–29, 1957.—Decided March 31, 1958.

*Osmond K. Fraenkel* argued the cause and filed the briefs for petitioner.

*Oscar H. Davis* argued the cause for respondents on the original argument, and *Solicitor General Rankin* on the reargument. With them on the briefs were *Warren Olney, III,* then Assistant Attorney General, and *J. F. Bishop. Beatrice Rosenberg* was also with them on the brief on the reargument.

MR. CHIEF JUSTICE WARREN announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS, and MR. JUSTICE WHITTAKER join.

The petitioner in this case, a native-born American, is declared to have lost his United States citizenship and become stateless by reason of his conviction by court-martial for wartime desertion. As in *Perez* v. *Brownell, ante,* p. 44, the issue before us is whether this forfeiture of citizenship comports with the Constitution.

The facts are not in dispute. In 1944 petitioner was a private in the United States Army, serving in French Morocco. On May 22, he escaped from a stockade at Casablanca, where he had been confined following a previous breach of discipline. The next day petitioner and a companion were walking along a road towards Rabat, in the general direction back to Casablanca, when an Army truck approached and stopped. A witness testified that petitioner boarded the truck willingly and that no words were spoken. In Rabat petitioner was turned over to military police. Thus ended petitioner's "desertion." He had been gone less than a day and had willingly surrendered to an officer on an Army vehicle while he was walking back towards his base. He testified that at the

time he and his companion were picked up by the Army truck, "we had decided to return to the stockade. The going was tough. We had no money to speak of, and at the time we were on foot and we were getting cold and hungry." A general court-martial convicted petitioner of ,desertion and sentenced him to three years at hard labor, forfeiture of all pay and allowances and a dishonorable discharge.

In 1952 petitioner applied for a passport. His application was denied on the ground that under the provisions of Section 401 (g) of the Nationality Act of 1940, as amended,[1] he had lost his citizenship by reason of his conviction and dishonorable discharge for wartime desertion. In 1955 petitioner commenced this action in the District Court, seeking a declaratory judgment that he is a citizen. The Government's motion for summary judgment was granted, and the Court of Appeals for the Second Circuit affirmed, Chief Judge Clark dissenting. 239 F. 2d 527. We granted certiorari. 352 U. S. 1023.

---

[1] 54 Stat. 1168, 1169, as amended, 58 Stat. 4, 8 U. S. C. § 1481 (a) (8):

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

.         .         .         .

"(g) Deserting the military or naval forces of the United States in time of war, provided he is convicted thereof by court martial and as the result of such conviction is dismissed or dishonorably discharged from the service of such military or naval forces: *Provided,* That notwithstanding loss of nationality or citizenship or civil or political rights under the terms of this or previous Acts by reason of desertion committed in time of war, restoration to active duty with such military or naval forces in time of war or the reenlistment or induction of such a person in time of war with permission of competent military or naval authority, prior or subsequent to the effective date of this Act, shall be deemed to have the immediate effect of restoring such nationality or citizenship and all civil and political rights heretofore or hereafter so lost and of removing all civil and political disabilities resulting therefrom . . . ."

Section 401 (g), the statute that decrees the forfeiture of this petitioner's citizenship, is based directly on a Civil War statute, which provided that a deserter would lose his "rights of citizenship." [2] The meaning of this phrase was not clear.[3] When the 1940 codification and revision of the nationality laws was prepared, the Civil War statute was amended to make it certain that what a convicted deserter would lose was nationality itself.[4] In 1944 the

[2] Act of March 3, 1865, 13 Stat. 487, 490.

[3] See Roche, The Loss of American Nationality—The Development of Statutory Expatriation, 99 U. of Pa. L. Rev. 25, 60–62. Administratively the phrase "rights of citizenship" was apparently taken to mean "citizenship." See Foreign Relations 1873, H. R. Exec. Doc. No. 1, 43d Cong., 1st Sess., Pt. 1, Vol. II, p. 1187 (view of Secretary of State Fish); H. R. Doc. No. 326, 59th Cong., 2d Sess. 159 (State Department Board); Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, 76th Cong., 1st Sess. 132–133 (testimony of Richard Flournoy, State Department representative).

[4] Hearings, at 133.

But it is not entirely clear, however, that the Congress fully appreciated the fact that Section 401 (g) rendered a convicted deserter stateless. In this regard, the following colloquy, which occurred during hearings in 1943 before the House Committee on Immigration and Naturalization between Congressmen Allen and Kearney, members of the Committee, and Edward J. Shaughnessy, then Deputy Commissioner of Immigration, is illuminating:

"Mr. ALLEN. If he is convicted [of desertion] by court martial in time of war, he loses his citizenship?

"Mr. SHAUGHNESSY. That is correct.

"Mr. ALLEN. In other words, that is the same thing as in our civil courts. When one is convicted of a felony and is sent to the penitentiary, one loses his citizenship.

"Mr. SHAUGHNESSY. He loses his rights of citizenship.

"Mr. KEARNEY. There is a difference between losing citizenship and losing civil rights.

"Mr. SHAUGHNESSY. He loses his civil rights, not his citizenship. Here he loses his citizenship.

"Mr. ALLEN. He loses his rights derived from citizenship.

statute was further amended to provide that a convicted deserter would lose his citizenship only if he was dismissed from the service or dishonorably discharged.[5]  At the same time it was provided that citizenship could be regained if the deserter was restored to active duty in wartime with the permission of the military authorities.

Though these amendments were added to ameliorate the harshness of the statute,[6] their combined effect produces a result that poses far graver problems than the ones that were sought to be solved.  Section 401 (g) as amended now gives the military authorities complete discretion to decide who among convicted deserters shall continue to be Americans and who shall be stateless.  By deciding whether to issue and execute a dishonorable discharge and whether to allow a deserter to re-enter the armed forces, the military becomes the arbiter of citizenship.  And the domain given to it by Congress is not as narrow as might be supposed.  Though the crime of desertion is one of the most serious in military law, it is by no means a rare event for a soldier to be convicted of this crime.  The elements of desertion are simply absence from duty plus the intention not to return.[7]  Into this

---

"Mr. SHAUGHNESSY. Yes; it almost amounts to the same thing. It is a technical difference.

"Mr. ALLEN. He is still an American citizen, but he has no rights.

"Mr. SHAUGHNESSY. No rights of citizenship."
Hearings before the House Committee on Immigration and Naturalization on H. R. 2207, 78th Cong., 1st Sess. 2–3.

See also id., at 7: "Mr. ELMER. Is it not true that this loss of citizenship for desertion is a State matter and that the Government has nothing to do with it?"

[5] Act of January 20, 1944, 58 Stat. 4.

[6] See S. Rep. No. 382, 78th Cong., 1st Sess. 1, 3; H. R. Rep. No. 302, 78th Cong., 1st Sess. 1; 89 Cong. Rec. 3241, 10135.

[7] Articles of War 58, 41 Stat. 800; Article 85, Uniform Code of Military Justice, 10 U. S. C. (Supp. V) § 885; Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 637.

category falls a great range of conduct, which may be prompted by a variety of motives—fear, laziness, hysteria or any emotional imbalance. The offense may occur not only in combat but also in training camps for draftees in this country.[8] The Solicitor General informed the Court that during World War II, according to Army estimates, approximately 21,000 soldiers and airmen were convicted of desertion and given dishonorable discharges by the sentencing courts-martial and that about 7,000 of these were actually separated from the service and thus rendered stateless when the reviewing authorities refused to remit their dishonorable discharges. Over this group of men, enlarged by whatever the corresponding figures may be for the Navy and Marines, the military has been given the power to grant or withhold citizenship. And the number of youths subject to this power could easily be enlarged simply by expanding the statute to cover crimes other than desertion. For instance, a dishonorable discharge itself might in the future be declared to be sufficient to justify forfeiture of citizenship.

Three times in the past three years we have been confronted with cases presenting important questions bearing on the proper relationship between civilian and military authority in this country.[9] A statute such as Section 401 (g) raises serious issues in this area, but in our view of this case it is unnecessary to deal with those problems. We conclude that the judgment in this case must be reversed for the following reasons.

## I.

In *Perez v. Brownell, supra,* I expressed the principles that I believe govern the constitutional status of United

---

[8] The Solicitor General stated in his argument that § 401 (g) would apply to desertion from such camps.

[9] *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11; *Reid* v. *Covert,* 354 U. S. 1; *Harmon* v. *Brucker,* 355 U. S. 579.

States citizenship. It is my conviction that citizenship is not subject to the general powers of the National Government and therefore cannot be divested in the exercise of those powers. The right may be voluntarily relinquished or abandoned either by express language or by language and conduct that show a renunciation of citizenship.

Under these principles, this petitioner has not lost his citizenship. Desertion in wartime, though it may merit the ultimate penalty, does not necessarily signify allegiance to a foreign state. Section 401 (g) is not limited to cases of desertion to the enemy, and there is no such element in this case. This soldier committed a crime for which he should be and was punished, but he did not involve himself in any way with a foreign state. There was no dilution of his allegiance to this country. The fact that the desertion occurred on foreign soil is of no consequence. The Solicitor General acknowledged that forfeiture of citizenship would have occurred if the entire incident had transpired in this country.

Citizenship is not a license that expires upon misbehavior. The duties of citizenship are numerous, and the discharge of many of these obligations is essential to the security and well-being of the Nation. The citizen who fails to pay his taxes or to abide by the laws safeguarding the integrity of elections deals a dangerous blow to his country. But could a citizen be deprived of his nationality for evading these basic responsibilities of citizenship? In time of war the citizen's duties include not only the military defense of the Nation but also full participation in the manifold activities of the civilian ranks. Failure to perform any of these obligations may cause the Nation serious injury, and, in appropriate circumstances, the punishing power is available to deal with derelictions of duty. But citizenship is not lost every time a duty of citizenship is shirked. And the deprivation of citi-

zenship is not a weapon that the Government may use to express its displeasure at a citizen's conduct, however reprehensible that conduct may be.   As long as a person does not voluntarily renounce or abandon his citizenship, and this petitioner has done neither, I believe his fundamental right of citizenship is secure.   On this ground alone the judgment in this case should be reversed.

## II.

Since a majority of the Court concluded in *Perez* v. *Brownell* that citizenship may be divested in the exercise of some governmental power, I deem it appropriate to state additionally why the action taken in this case exceeds constitutional limits, even under the majority's decision in *Perez*.   The Court concluded in *Perez* that citizenship could be divested in the exercise of the foreign affairs power.   In this case, it is urged that the war power is adequate to support the divestment of citizenship.   But there is a vital difference between the two statutes that purport to implement these powers by decreeing loss of citizenship.   The statute in *Perez* decreed loss of citizenship—so the majority concluded— to eliminate those international problems that were thought to arise by reason of a citizen's having voted in a foreign election.   The statute in this case, however, is entirely different.   Section 401 (g) decrees loss of citizenship for those found guilty of the crime of desertion. It is essentially like Section 401 (j) of the Nationality Act, decreeing loss of citizenship for evading the draft by remaining outside the United States.[10]   This provision

---

[10] 54 Stat. 1168, as amended, 58 Stat. 746, 8 U. S. C. § 1481 (a) (10) :

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

"(j) Departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the

was also before the Court in *Perez,* but the majority
declined to consider its validity. While Section 401 (j)
decrees loss of citizenship without providing any sem-
blance of procedural due process whereby the guilt of the
draft evader may be determined before the sanction is
imposed, Section 401 (g), the provision in this case,
accords the accused deserter at least the safeguards of an
adjudication of guilt by a court-martial.

The constitutional question posed by Section 401 (g)
would appear to be whether or not denationalization may
be inflicted as a punishment, even assuming that citizen-
ship may be divested pursuant to some governmental
power. But the Government contends that this statute
does not impose a penalty and that constitutional limita-
tions on the power of Congress to punish are therefore
inapplicable. We are told this is so because a committee
of Cabinet members, in recommending this legislation to
the Congress, said it "technically is not a penal law." [11]
How simple would be the tasks of constitutional adjudi-
cation and of law generally if specific problems could be
solved by inspection of the labels pasted on them! Mani-
festly the issue of whether Section 401 (g) is a penal law
cannot be thus determined. Of course it is relevant to
know the classification employed by the Cabinet Com-
mittee that played such an important role in the prepara-
tion of the Nationality Act of 1940. But it is equally
relevant to know that this very committee acknowledged
that Section 401 (g) was based on the provisions of the
1865 Civil War statute, which the committee itself termed
"distinctly penal in character." [12] Furthermore, the 1865

---

President to be a period of national emergency for the purpose of
evading or avoiding training and service in the land or naval forces
of the United States."

[11] Codification of the Nationality Laws of the United States, H. R.
Comm. Print, Pt. 1, 76th Cong., 1st Sess. 68.

[12] *Ibid.*

statute states in terms that deprivation of the rights of citizenship is "in addition to the other lawful penalties of the crime of desertion . . . ." [13]  And certainly it is relevant to know that the reason given by the Senate Committee on Immigration as to why loss of nationality under Section 401 (g) can follow desertion only after conviction by court-martial was "because the penalty is so drastic." [14] Doubtless even a clear legislative classification of a statute as "non-penal" would not alter the fundamental nature of a plainly penal statute.[15]  With regard to Section 401 (g) the fact is that the views of the Cabinet Committee and of the Congress itself as to the nature of the statute are equivocal, and cannot possibly provide the answer to our inquiry.  Determination of whether this statute is a penal law requires careful consideration.

In form Section 401 (g) appears to be a regulation of nationality.  The statute deals initially with the status of nationality and then specifies the conduct that will result in loss of that status.  But surely form cannot provide the answer to this inquiry.  A statute providing that "a person shall lose his liberty by committing bank robbery," though in form a regulation of liberty, would nonetheless be penal.  Nor would its penal effect be altered by labeling it a regulation of banks or by arguing that there is a rational connection between safeguarding banks and imprisoning bank robbers.  The inquiry must be directed to substance.

This Court has been called upon to decide whether or not various statutes were penal ever since 1798.  *Calder* v. *Bull,* 3 Dall. 386.  Each time a statute has been challenged as being in conflict with the constitutional prohibitions against bills of attainder and *ex post facto*

---

[13] Act of March 3, 1865, 13 Stat. 487.

[14] S. Rep. No. 2150, 76th Cong., 3d Sess. 3.

[15] *United States* v. *Constantine,* 296 U. S. 287, 294; *United States* v. *La Franca,* 282 U. S. 568, 572.

laws,[16] it has been necessary to determine whether a penal law was involved, because these provisions apply only to statutes imposing penalties.[17] In deciding whether or not a law is penal, this Court has generally based its determination upon the purpose of the statute.[18] If the statute imposes a disability for the purposes of punishment—that is, to reprimand the wrongdoer, to deter others, etc.—it has been considered penal.[19] But a statute has been considered nonpenal if it imposes a disability, not to punish, but to accomplish some other legitimate governmental purpose.[20] The Court has recognized that any statute decreeing some adversity as a consequence of certain conduct may have both a penal and a nonpenal effect. The controlling nature of such statutes normally depends on the evident purpose of the legislature. The point may be illustrated by the situation of an ordinary felon. A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote.[21] If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal. But because the purpose of

[16] U. S. Const., Art. I, § 9, cl. 3; § 10, cl. 1.

[17] *United States* v. *Lovett*, 328 U. S. 303; *Calder* v. *Bull*, 3 Dall. 386.

[18] Of course, the severity of the disability imposed as well as all the circumstances surrounding the legislative enactment is relevant to this decision. See, generally, Wormuth, Legislative Disqualifications as Bills of Attainder, 4 Vand. L. Rev. 603, 608–610; 64 Yale L. J. 712, 722–724.

[19] *E. g.*, *United States* v. *Lovett*, *supra*; *Pierce* v. *Carskadon*, 16 Wall. 234; *Ex parte Garland*, 4 Wall. 333; *Cummings* v. *Missouri*, 4 Wall. 277.

[20] *E. g.*, *Mahler* v. *Eby*, 264 U. S. 32; *Hawker* v. *New York*, 170 U. S. 189; *Davis* v. *Beason*, 133 U. S. 333; *Murphy* v. *Ramsey*, 114 U. S. 15.

[21] See Gathings, Loss of Citizenship and Civil Rights for Conviction of Crime, 43 Am. Pol. Sci. Rev. 1228.

the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.[22]

The same reasoning applies to Section 401 (g). The purpose of taking away citizenship from a convicted deserter is simply to punish him. There is no other legitimate purpose that the statute could serve. Denationalization in this case is not even claimed to be a means of solving international problems, as was argued in *Perez.* Here the purpose is punishment, and therefore the statute is a penal law.

It is urged that this statute is not a penal law but a regulatory provision authorized by the war power. It cannot be denied that Congress has power to prescribe rules governing the proper performance of military obligations, of which perhaps the most significant is the performance of one's duty when hazardous or important service is required. But a statute that prescribes the consequence that will befall one who fails to abide by these regulatory provisions is a penal law. Plainly legislation prescribing imprisonment for the crime of desertion is penal in nature. If loss of citizenship is substituted for imprisonment, it cannot fairly be said that the use of this particular sanction transforms the fundamental nature of the statute. In fact, a dishonorable discharge with consequent loss of citizenship might be the only punishment meted out by a court-martial. During World War II the threat of this punishment was explicitly communicated by the Army to soldiers in the field.[23] If this statute taking away citizenship is a congressional exercise of the war power, then it cannot rationally be treated other than as a penal law, because it imposes the sanction of denational-

---

[22] Cf. *Davis* v. *Beason, supra; Murphy* v. *Ramsey, supra.*

[23] See War Department Circular No. 273, 1942, Compilation of War Department General Orders, Bulletins and Circulars (Government Printing Office 1943) 343.

ization for the purpose of punishing transgression of a standard of conduct prescribed in the exercise of that power.

The Government argues that the sanction of denationalization imposed by Section 401 (g) is not a penalty because deportation has not been so considered by this Court. While deportation is undoubtedly a harsh sanction that has a severe penal effect, this Court has in the past sustained deportation as an exercise of the sovereign's power to determine the conditions upon which an alien may reside in this country.[24] For example, the statute [25] authorizing deportation of an alien convicted under the 1917 Espionage Act [26] was viewed, not as designed to punish him for the crime of espionage, but as an implementation of the sovereign power to exclude, from which the deporting power is derived. *Mahler* v. *Eby,* 264 U. S. 32. This view of deportation may be highly fictional, but even if its validity is conceded, it is wholly inapplicable to this case. No one contends that the Government has, in addition to the power to exclude all aliens, a sweeping power to denationalize all citizens. Nor does comparison to denaturalization eliminate the penal effect of denationalization in this case. Denaturalization is not imposed to penalize the alien for having falsified his application for citizenship; if it were, it would be a punishment. Rather, it is imposed in the exercise of the power to make rules for the naturalization of aliens.[27] In short, the fact that deportation and denaturalization for fraudulent procurement of citizenship may be imposed for purposes other than punishment affords no

---

[24] *Mahler* v. *Eby, supra; Bugajewitz* v. *Adams,* 228 U. S. 585; *Fong Yue Ting* v. *United States,* 149 U. S. 698.

[25] Act of May 10, 1920, 41 Stat. 593.

[26] Act of June 15, 1917, 40 Stat. 217.

[27] See, *e. g., Baumgartner* v. *United States,* 322 U. S. 665; *Schneiderman* v. *United States,* 320 U. S. 118.

basis for saying that in this case denationalization is not a punishment.

Section 401 (g) is a penal law, and we must face the question whether the Constitution permits the Congress to take away citizenship as a punishment for crime. If it is assumed that the power of Congress extends to divestment of citizenship, the problem still remains as to this statute whether denationalization is a cruel and unusual punishment within the meaning of the Eighth Amendment.[28] Since wartime desertion is punishable by death, there can be no argument that the penalty of denationalization is excessive in relation to the gravity of the crime. The question is whether this penalty subjects the individual to a fate forbidden by the principle of civilized treatment guaranteed by the Eighth Amendment.

At the outset, let us put to one side the death penalty as an index of the constitutional limit on punishment. Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment—and they are forceful—the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty. But it is equally plain that the existence of the death penalty is not a license to the Government to devise any punishment short of death within the limit of its imagination.

The exact scope of the constitutional phrase "cruel and unusual" has not been detailed by this Court.[29] But the

---

[28] U. S. Const., Amend. VIII: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

[29] See *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459; *Weems* v. *United States,* 217 U. S. 349; *Howard* v. *Fleming,* 191 U. S. 126; *O'Neil* v. *Vermont,* 144 U. S. 323; *In re Kemmler,* 136 U. S. 436; *Wilkerson* v. *Utah,* 99 U. S. 130.

basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688,[30] and the principle it represents can be traced back to the Magna Carta.[31] The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. Fines, imprisonment and even execution may be imposed depending upon the enormity of the crime, but any technique outside the bounds of these traditional penalties is constitutionally suspect. This Court has had little occasion to give precise content to the Eighth Amendment, and, in an enlightened democracy such as ours, this is not surprising. But when the Court was confronted with a punishment of 12 years in irons at hard and painful labor imposed for the crime of falsifying public records, it did not hesitate to declare that the penalty was cruel in its excessiveness and unusual in its character. *Weems* v. *United States*, 217 U. S. 349. The Court recognized in that case that the words of the Amendment are not precise,[32] and that their

---

[30] 1 Wm. & Mary, 2d Sess. (1689), c. 2.

[31] See 34 Minn. L. Rev. 134; 4 Vand. L. Rev. 680.

[32] Whether the word "unusual" has any qualitative meaning different from "cruel" is not clear. On the few occasions this Court has had to consider the meaning of the phrase, precise distinctions between cruelty and unusualness do not seem to have been drawn. See *Weems* v. *United States, supra; O'Neil* v. *Vermont, supra; Wilkerson* v. *Utah, supra.* These cases indicate that the Court simply examines the particular punishment involved in light of the basic prohibition against inhuman treatment, without regard to any subtleties of meaning that might be latent in the word "unusual." But cf. *In re Kemmler, supra,* at 443; *United States ex rel. Milwaukee Social Democratic Publishing Co.* v. *Burleson,* 255 U. S. 407, 430 (Brandeis, J., dissenting). If the word "unusual" is to have any mean-

scope is not static. The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.

We believe, as did Chief Judge Clark in the court below,[33] that use of denationalization as a punishment is barred by the Eighth Amendment. There may be involved no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. While any one country may accord him some rights, and presumably as long as he remained in this country he would enjoy the limited rights of an alien, no country need do so because he is stateless. Furthermore, his enjoyment of even the limited rights of an alien might be subject to termination

---

ing apart from the word "cruel," however, the meaning should be the ordinary one, signifying something different from that which is generally done. Denationalization as a punishment certainly meets this test. It was never explicitly sanctioned by this Government until 1940 and never tested against the Constitution until this day.

[33] "Plaintiff-appellant has cited to us and obviously relied on the masterful analysis of expatriation legislation set forth in the Comment, The Expatriation Act of 1954, 64 Yale L. J. 1164, 1189–1199. I agree with the author's documented conclusions therein that punitive expatriation of persons with no other nationality constitutes cruel and unusual punishment and is invalid as such. Since I doubt if I can add to the persuasive arguments there made, I shall merely incorporate by reference. In my faith, the American concept of man's dignity does not comport with making even those we would punish completely 'stateless'—fair game for the despoiler at home and the oppressor abroad, if indeed there is any place which will tolerate them at all." 239 F. 2d 527, 530.

at any time by reason of deportation.[34]   In short, the expatriate has lost the right to have rights.

This punishment is offensive to cardinal principles for which the Constitution stands.   It subjects the individual to a fate of ever-increasing fear and distress.   He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated.   He may be subject to banishment, a fate universally decried by civilized people.   He is stateless, a condition deplored in the international community of democracies.[35]   It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person.   The threat makes the punishment obnoxious.[36]

The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime.   It is true that several countries prescribe expatriation in the event that their nationals engage in conduct in derogation of native allegiance.[37]   Even statutes of this sort are generally applicable primarily

---

[34] See discussion in *Perez* v. *Brownell, ante,* p. 44, at 64.

[35] See *Study on Statelessness,* U. N. Doc. No. E/1112; Seckler-Hudson, Statelessness: With Special Reference to the United States; Borchard, Diplomatic Protection of Citizens Abroad, §§ 262, 334.

[36] The suggestion that judicial relief will be available to alleviate the potential rigors of statelessness assumes too much.   Undermining such assumption is the still fresh memory of *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, where an alien, resident in this country for 25 years, returned from a visit abroad to find himself barred from this country and from all others to which he turned. Summary imprisonment on Ellis Island was his fate, without any judicial examination of the grounds of his confinement.   This Court denied relief, and the intolerable situation was remedied after four years' imprisonment only through executive action as a matter of grace.   See N. Y. Times, Aug. 12, 1954, p. 10, col. 4.

[37] See Laws Concerning Nationality, U. N. Doc. No. ST/LEG/SER.B/4 (1954).

to naturalized citizens. But use of denationalization as punishment for crime is an entirely different matter. The United Nations' survey of the nationality laws of 84 nations of the world reveals that only two countries, the Philippines and Turkey, impose denationalization as a penalty for desertion.[38] In this country the Eighth Amendment forbids this to be done.

In concluding as we do that the Eighth Amendment forbids Congress to punish by taking away citizenship, we are mindful of the gravity of the issue inevitably raised whenever the constitutionality of an Act of the National Legislature is challenged. No member of the Court believes that in this case the statute before us can be construed to avoid the issue of constitutionality. That issue confronts us, and the task of resolving it is inescapably ours. This task requires the exercise of judgment, not the reliance upon personal preferences. Courts must not consider the wisdom of statutes but neither can they sanction as being merely unwise that which the Constitution forbids.

We are oath-bound to defend the Constitution. This obligation requires that congressional enactments be judged by the standards of the Constitution. The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights. When the Government acts to take away the fundamental right of citizenship, the safeguards of the Constitution should be examined with special diligence.

The provisions of the Constitution are not time-worn adages or hollow shibboleths. They are vital, living principles that authorize and limit governmental powers in our Nation. They are the rules of government. When the constitutionality of an Act of Congress is challenged in this Court, we must apply those rules. If we

---

[38] *Id.*, at 379 and 461. Cf. Nationality Law of August 22, 1907, Art. 17 (2) (Haiti), *id.*, at 208.

do not, the words of the Constitution become little more than good advice.

When it appears that an Act of Congress conflicts with one of these provisions, we have no choice but to enforce the paramount commands of the Constitution. We are sworn to do no less. We cannot push back the limits of the Constitution merely to accommodate challenged legislation. We must apply those limits as the Constitution prescribes them, bearing in mind both the broad scope of legislative discretion and the ultimate responsibility of constitutional adjudication. We do well to approach this task cautiously, as all our predecessors have counseled. But the ordeal of judgment cannot be shirked. In some 81 instances since this Court was established it has determined that congressional action exceeded the bounds of the Constitution. It is so in this case.

The judgment of the Court of Appeals for the Second Circuit is reversed and the cause is remanded to the District Court for appropriate proceedings.

*Reversed and remanded.*

MR. JUSTICE BLACK, whom MR. JUSTICE DOUGLAS joins, concurring.

While I concur in the opinion of THE CHIEF JUSTICE there is one additional thing that needs to be said.

Even if citizenship could be involuntarily divested, I do not believe that the power to denationalize may be placed in the hands of military authorities. If desertion or other misconduct is to be a basis for forfeiting citizenship, guilt should be determined in a civilian court of justice where all the protections of the Bill of Rights guard the fairness of the outcome. Such forfeiture should not rest on the findings of a military tribunal. Military courts may try soldiers and punish them for military offenses, but they should not have the last word on the soldier's right to citizenship. The statute held invalid

here not only makes the military's finding of desertion final but gives military authorities discretion to choose which soldiers convicted of desertion shall be allowed to keep their citizenship and which ones shall thereafter be stateless. Nothing in the Constitution or its history lends the slightest support for such military control over the right to be an American citizen.

MR. JUSTICE BRENNAN, concurring.

In *Perez* v. *Brownell, ante,* p. 44, also decided today, I agreed with the Court that there was no constitutional infirmity in § 401 (e), which expatriates the citizen who votes in a foreign political election. I reach a different conclusion in this case, however, because I believe that § 401 (g), which expatriates the wartime deserter who is dishonorably discharged after conviction by court-martial, lies beyond Congress' power to enact. It is, concededly, paradoxical to justify as constitutional the expatriation of the citizen who has committed no crime by voting in a Mexican political election, yet find unconstitutional a statute which provides for the expatriation of a soldier guilty of the very serious crime of desertion in time of war. The loss of citizenship may have as ominous significance for the individual in the one case as in the other. Why then does not the Constitution prevent the expatriation of the voter as well as the deserter?

Here, as in *Perez* v. *Brownell,* we must inquire whether there exists a relevant connection between the particular legislative enactment and the power granted to Congress by the Constitution. The Court there held that such a relevant connection exists between the power to maintain relations with other sovereign nations and the power to expatriate the American who votes in a foreign election. (1) Within the power granted to Congress to regulate the conduct of foreign affairs lies the power to deal with evils which might obstruct or embarrass our diplomatic

interests.    Among these evils, Congress might believe, is that of voting by American citizens in political elections of other nations.[1]    Whatever the realities of the situation, many foreign nations may well view political activity on the part of Americans, even if lawful, as either expressions of official American positions or else as improper meddling in affairs not their own.    In either event the reaction is liable to be detrimental to the interests of the United States.    (2) Finding that this was an evil which Congress was empowered to prevent, the Court concluded that expatriation was a means reasonably calculated to achieve this end.    Expatriation, it should be noted, has the advantage of acting automatically, for the very act of casting the ballot is the act of denationalization, which could have the effect of cutting off American responsibility for the consequences.    If a foreign government objects, our answer should be conclusive—the voter is no longer one of ours.    Harsh as the consequences may be to the individual concerned, Congress has ordained the loss of citizenship simultaneously with the act of voting because Congress might reasonably believe that in these circumstances there is no acceptable alternative to expatriation as a means of avoiding possible embarrassments to our relations with foreign nations.[2]    And where Congress has determined that considerations of the highest national importance indicate a course of action for which an ade-

---

[1] Some indication of the problem is to be seen in the joint resolutions introduced in both houses of Congress to exempt the two or three thousand Americans who allegedly lost their citizenship by voting in certain Italian elections.    See S. J. Res. 47 and H. J. Res. 30, 239, 375, 81st Cong., 1st Sess.    All proposed "to suspend the operation of section 401 (e) of the Nationality Act of 1940 in certain cases."    See also H. R. 6400, 81st Cong., 1st Sess.

[2] *Perez* v. *Brownell* did not raise questions under the First Amendment, which of course would have the effect in appropriate cases of limiting congressional power otherwise possessed.

quate substitute might rationally appear lacking, I cannot say that this means lies beyond Congress' power to choose. Cf. *Korematsu* v. *United States,* 323 U. S. 214.

In contrast to § 401 (e), the section with which we are now concerned, § 401 (g), draws upon the power of Congress to raise and maintain military forces to wage war. No pretense can here be made that expatriation of the deserter in any way relates to the conduct of foreign affairs, for this statute is not limited in its effects to those who desert in a foreign country or who flee to another land. Nor is this statute limited in its application to the deserter whose conduct imports "elements of an allegiance to another country in some measure, at least, inconsistent with American citizenship." *Perez* v. *Brownell, supra,* at 61. The history of this provision, indeed, shows that the essential congressional purpose was a response to the needs of the military in maintaining discipline in the armed forces, especially during wartime. There can be no serious question that included in Congress' power to maintain armies is the power to deal with the problem of desertion, an act plainly destructive, not only of the military establishment as such, but, more importantly, of the Nation's ability to wage war effectively. But granting that Congress is authorized to deal with the evil of desertion, we must yet inquire whether expatriation is a means reasonably calculated to achieve this legitimate end and thereby designed to further the ultimate congressional objective—the successful waging of war.

Expatriation of the deserter originated in the Act of 1865, 13 Stat. 490, when wholesale desertion and draft-law violations seriously threatened the effectiveness of the Union armies.[3] The 1865 Act expressly provided

---

[3] A good description of the extent of the problem raised by desertions from the Union armies, and of the extreme measures taken to combat the problem, will be found in Pullen, The Twentieth Maine: A Volunteer Regiment of the Civil War (1957).

that expatriation was to be "in addition to the other lawful penalties of the crime of desertion . . . ." This was emphasized in the leading case under the 1865 Act, *Huber* v. *Reily*, 53 Pa. 112, decided by the Pennsylvania Supreme Court little more than a year after passage of the Act. The court said that "Its avowed purpose is to add to the penalties which the law had previously affixed to the offence of desertion from the military or naval service of the United States, and it denominates the additional sanctions provided as penalties." *Id.*, at 114–115.

But, although it imposed expatriation entirely as an added punishment for crime, the 1865 Act did not expressly make conviction by court-martial a prerequisite to that punishment, as was the case with the conventional penalties. The Pennsylvania Supreme Court felt that Huber was right in contending that this was a serious constitutional objection: "[T]he act proposes to inflict pains and penalties upon offenders before and without a trial and conviction by due process of law, and . . . it is therefore prohibited by the Bill of Rights." 53 Pa., at 115. The court, however, construed the statute so as to avoid these constitutional difficulties, holding that loss of citizenship, like other penalties for desertion, followed only upon conviction by court-martial.

This view of the 1865 Act was approved by this Court in *Kurtz* v. *Moffitt*, 115 U. S. 487, 501, and, as noted there, the same view "has been uniformly held by the civil courts as well as by the military authorities." See *McCafferty* v. *Guyer*, 59 Pa. 109; *State* v. *Symonds*, 57 Me. 148; *Gotcheus* v. *Matheson*, 58 Barb. (N. Y.) 152; 2 Winthrop, Military Law and Precedents (2d ed. 1896), 1001.[4] Of

---

[4] The opinion in *Huber* v. *Reily*, which was written by Mr. Justice Strong, later a member of this Court, suggested, if it did not hold, that the statutes and considerations of due process required that expatriation, to be accomplished, should be specifically included by

particular significance, moreover, is the fact that the Congress has confirmed the correctness of the view that it purposed expatriation of the deserter solely as additional punishment. The present § 401 (g) merely incorporates the 1865 provision in the codification which became the 1940 Nationality Act.[5] But now there is expressly stated what was omitted from the 1865 Act, namely, that the deserter shall be expatriated "if and when he is convicted thereof by court martial . . . ." 54 Stat. 1169, as amended, 8 U. S. C. § 1481 (a)(8).[6]

It is difficult, indeed, to see how expatriation of the deserter helps wage war except as it performs that function when imposed as punishment. It is obvious that expatriation cannot in any wise avoid the harm apprehended by Congress. After the act of desertion, only

---

the court-martial as part of the sentence. See 53 Pa., at 119–120. The court-martial, under military law, adjudges both guilt and the extent of initial sentence. *Jackson* v. *Taylor*, 353 U. S. 569, 574–575; and see Article of War 58 (1920), 41 Stat. 800. However, it has not been the practice specifically to include expatriation as part of the sentence. 2 Winthrop, Military Law and Precedents (2d ed. 1896), 1001.

[5] The provision was limited in 1912 to desertion in time of war, 37 Stat. 356, but otherwise was not revised until carried into the Nationality Act of 1940, 54 Stat. 1169. It was, however, first codified as part of the laws concerning citizenship as § 1998 of the 1874 Revised Statutes.

[6] The reason for the addition of the proviso is stated in a report, Codification of the Nationality Laws of the United States, H. R. Comm. Print, Pt. 1, 76th Cong., 1st Sess., prepared at the request of the President by the Secretary of State, the Attorney General, and the Secretary of Labor, proposing a revision and codification of the nationality laws: "The provisions of sections 1996 and 1998 of the Revised Statutes are distinctly penal in character. They must, therefore, be construed strictly, and the penalties take effect only upon conviction by a court martial (*Huber* v. *Reilly*, 1866, 53 Penn. St. 112; *Kurtz* v. *Moffitt*, 1885, 115 U. S. 487)." *Id.*, at 68.

The reference later in the report that § 401 "technically is not a penal law" is to the section as a whole and not to subdivision (g).

punishment can follow, for the harm has been done. The deserter, moreover, does not cease to be an American citizen at the moment he deserts. Indeed, even conviction does not necessarily effect his expatriation, for dishonorable discharge is the condition precedent to loss of citizenship. Therefore, if expatriation is made a consequence of desertion, it must stand together with death and imprisonment—as a form of punishment.

To characterize expatriation as punishment is, of course, but the beginning of critical inquiry. As punishment it may be extremely harsh, but the crime of desertion may be grave indeed. However, the harshness of the punishment may be an important consideration where the asserted power to expatriate has only a slight or tenuous relation to the granted power. In its material forms no one can today judge the precise consequences of expatriation, for happily American law has had little experience with this status, and it cannot be said hypothetically to what extent the severity of the status may be increased consistently with the demands of due process. But it can be supposed that the consequences of greatest weight, in terms of ultimate impact on the petitioner, are unknown and unknowable.[7] Indeed, in truth, he may live out his life with but minor inconvenience. He may perhaps live, work, marry, raise a family, and generally experience a satisfactorily happy life. Nevertheless it cannot be denied that the impact of expatriation— especially where statelessness is the upshot—may be severe. Expatriation, in this respect, constitutes an

---

[7] Adjudication of hypothetical and contingent consequences is beyond the function of this Court and the incidents of expatriation are altogether indefinite. Nonetheless, this very uncertainty of the consequences makes expatriation as punishment severe.

It is also unnecessary to consider whether the consequences would be different for the citizen expatriated under another section than § 401 (g).

especially demoralizing sanction. The uncertainty, and the consequent psychological hurt, which must accompany one who becomes an outcast in his own land must be reckoned a substantial factor in the ultimate judgment.

In view of the manifest severity of this sanction, I feel that we should look closely at its probable effect to determine whether Congress' imposition of expatriation as a penal device is justified in reason. Clearly the severity of the penalty, in the case of a serious offense, is not enough to invalidate it where the nature of the penalty is rationally directed to achieve the legitimate ends of punishment.

The novelty of expatriation as punishment does not alone demonstrate its inefficiency. In recent years we have seen such devices as indeterminate sentences and parole added to the traditional term of imprisonment. Such penal methods seek to achieve the end, at once more humane and effective, that society should make every effort to rehabilitate the offender and restore him as a useful member of that society as society's own best protection. Of course, rehabilitation is but one of the several purposes of the penal law. Among other purposes are deterrents of the wrongful act by the threat of punishment and insulation of society from dangerous individuals by imprisonment or execution. What then is the relationship of the punishment of expatriation to these ends of the penal law? It is perfectly obvious that it constitutes the very antithesis of rehabilitation, for instead of guiding the offender back into the useful paths of society it excommunicates him and makes him, literally, an outcast. I can think of no more certain way in which to make a man in whom, perhaps, rest the seeds of serious antisocial behavior more likely to pursue further a career of unlawful activity than to place on him the stigma of the derelict, uncertain of many of his basic rights. Similarly, it must be questioned whether expa-

triation can really achieve the other effects sought by society in punitive devices. Certainly it will not insulate society from the deserter, for unless coupled with banishment the sanction leaves the offender at large. And as a deterrent device this sanction would appear of little effect, for the offender, if not deterred by thought of the specific penalties of long imprisonment or even death, is not very likely to be swayed from his course by the prospect of expatriation.[8] However insidious and demoralizing may be the actual experience of statelessness, its contemplation in advance seems unlikely to invoke serious misgiving, for none of us yet knows its ramifications.

In the light of these considerations, it is understandable that the Government has not pressed its case on the basis of expatriation of the deserter as punishment for his crime. Rather, the Government argues that the necessary nexus to the granted power is to be found in the idea that legislative withdrawal of citizenship is justified in this case because Trop's desertion constituted a refusal to perform one of the highest duties of American citizenship—the bearing of arms in a time of desperate national peril. It cannot be denied that there is implicit in this a certain rough justice. He who refuses to act as an American should no longer be an American—what could be fairer? But I cannot see that this is anything other than forcing retribution from the offender—naked vengeance. But many acts of desertion certainly fall far short of a "refusal to perform this ultimate duty of American citizenship."

---

[8] A deterrent effect is certainly conjectural when we are told that during World War II as many as 21,000 soldiers were convicted of desertion and sentenced to be dishonorably discharged. From the fact that the reviewing authorities ultimately remitted the dishonorable discharges in about two-thirds of these cases it is possible to infer that the military itself had no firm belief in the deterrent effects of expatriation.

Desertion is defined as "absence without leave accompanied by the intention not to return." Army Manual for Courts-Martial (1928) 142. The offense may be quite technical, as where an officer, "having tendered his resignation and prior to due notice of the acceptance of the same, quits his post or proper duties without leave and with intent to absent himself permanently therefrom . . . ." Article of War 28 (1920), 41 Stat. 792. Desertion is also committed where a soldier, without having received a regular discharge, re-enlists in the same or another service. The youngster, for example, restive at his assignment to a supply depot, who runs off to the front to be in the fight, subjects himself to the possibility of this sanction. Yet the statute imposes the penalty coextensive with the substantive crime. Since many acts of desertion thus certainly fall far short of a "refusal to perform this ultimate duty of American citizenship," it stretches the imagination excessively to establish a rational relation of mere retribution to the ends purported to be served by expatriation of the deserter. I simply cannot accept a judgment that Congress is free to adopt any measure at all to demonstrate its displeasure and exact its penalty from the offender against its laws.

It seems to me that nothing is solved by the uncritical reference to service in the armed forces as the "ultimate duty of American citizenship." Indeed, it is very difficult to imagine, on this theory of power, why Congress cannot impose expatriation as punishment for any crime at all—for tax evasion, for bank robbery, for narcotics offenses. As citizens we are also called upon to pay our taxes and to obey the laws, and these duties appear to me to be fully as related to the nature of our citizenship as our military obligations. But Congress' asserted power to expatriate the deserter bears to the war powers precisely the same relation as its power to expatriate the tax evader would bear to the taxing power.

I therefore must conclude that § 401 (g) is beyond the power of Congress to enact. Admittedly Congress' belief that expatriation of the deserter might further the war effort may find some—though necessarily slender—support in reason. But here, any substantial achievement, by this device, of Congress' legitimate purposes under the war power seems fairly remote. It is at the same time abundantly clear that these ends could more fully be achieved by alternative methods not open to these objections. In the light of these factors, and conceding all that I possibly can in favor of the enactment, I can only conclude that the requisite rational relation between this statute and the war power does not appear—for in this relation the statute is not "really calculated to effect any of the objects entrusted to the government . . . ," *M'Culloch* v. *Maryland*, 4 Wheat. 316, 423—and therefore that § 401 (g) falls beyond the domain of Congress.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BURTON, MR. JUSTICE CLARK and MR. JUSTICE HARLAN join, dissenting.

Petitioner was born in Ohio in 1924. While in the Army serving in French Morocco in 1944, he was tried by a general court-martial and found guilty of having twice escaped from confinement, of having been absent without leave, and of having deserted and remained in desertion for one day. He was sentenced to a dishonorable discharge, forfeiture of all pay and allowances and confinement at hard labor for three years. He subsequently returned to the United States. In 1952 he applied for a passport; this application was denied by the State Department on the ground that petitioner had lost his citizenship as a result of his conviction of and dishonorable discharge for desertion from the Army in time of war. The Department relied upon § 401 of the

Nationality Act of 1940, 54 Stat. 1137, 1168, as amended by the Act of January 20, 1944, 58 Stat. 4, which provided, in pertinent part,[1] that

"A person who is a national of the United States, whether by birth or naturalization, shall lose his nationality by:

.        .        .        . ˙      .

"(g) Deserting the military or naval forces of the United States in time of war, provided he is convicted thereof by court martial and as the result of such conviction is dismissed or dishonorably discharged from the service of such military or naval forces: *Provided,* That notwithstanding loss of nationality or citizenship or civil or political rights under the terms of this or previous Acts by reason of desertion committed in time of war, restoration to active duty with such military or naval forces in time of war or the reenlistment or induction of such a person in time of war with permission of competent military or naval authority, prior or subsequent to the effective date of this Act, shall be deemed to have the immediate effect of restoring such nationality or citizenship and all civil and political rights heretofore or hereafter so lost and of removing all civil and political disabilities resulting therefrom . . . ."

In 1955 petitioner brought suit in a United States District Court for a judgment declaring him to be a national of the United States. The Government's motion for summary judgment was granted and petitioner's denied.

---

[1] The substance of this provision now appears in § 349 (a) (8) of the Immigration and Nationality Act of 1952, 66 Stat. 163, 268, 8 U. S. C. § 1481 (a) (8).

The Court of Appeals for the Second Circuit affirmed, one judge dissenting.   239 F. 2d 527.

At the threshold the petitioner suggests constructions of the statute that would avoid consideration of constitutional issues.   If such a construction is precluded, petitioner contends that Congress is without power to attach loss of citizenship as a consequence of conviction for desertion.   He also argues that such an exercise of power would violate the Due Process Clause of the Fifth Amendment to the Constitution and the prohibition against cruel and unusual punishments in the Eighth Amendment.

The subsection of § 401 of the Nationality Act of 1940, as amended, making loss of nationality result from a conviction for desertion in wartime is a direct descendant of a provision enacted during the Civil War.   One section of "An Act to amend the several Acts heretofore passed to provide for the Enrolling and Calling out [of] the National Forces, and for other Purposes," 13 Stat. 487, 490, approved on March 3, 1865, provided that "in addition to the other lawful penalties of the crime of desertion from the military or naval service," all persons who desert such service "shall be deemed and taken to have voluntarily relinquished and forfeited their rights of citizenship and their rights to become citizens . . . ."   Except as limited in 1912 to desertion in time of war, 37 Stat. 356, the provision remained in effect until absorbed into the Nationality Act of 1940.   54 Stat. 1137, 1169, 1172. Shortly after its enactment the 1865 provision received an important interpretation in *Huber* v. *Reily,* 53 Pa. 112 (1866).   There, the Supreme Court of Pennsylvania, in an opinion by Mr. Justice Strong, later of this Court, held that the disabilities of the 1865 Act could attach only after the individual had been convicted of desertion by a court-martial.   The requirement was drawn from the Due Process Clause of the Fifth Amendment to the Constitution.   53 Pa., at 116–118.   This interpretation was

followed by other courts, *e. g., State* v. *Symonds,* 57 Me. 148, and was referred to approvingly by this Court in 1885 in *Kurtz* v. *Moffitt,* 115 U. S. 487, without discussion of its rationale.

When the nationality laws of the United States were revised and codified as the Nationality Act of 1940, 54 Stat. 1137, there was added to the list of acts that result in loss of American nationality, "Deserting the military or naval service of the United States in time of war, provided he [the deserter] is convicted thereof by a court martial." § 401 (g), 54 Stat. 1169. During the consideration of the Act, there was substantially no debate on this provision. It seems clear, however, from the report of the Cabinet Committee that had recommended its adoption that nothing more was intended in its enactment than to incorporate the 1865 provision into the 1940 codification, at the same time making it clear that nationality, and not the ambiguous "rights of citizenship," [2] was to be lost and that the provision applied to all nationals. Codification of the Nationality Laws of the United States, H. R. Comm. Print, Pt. 1, 76th Cong., 1st Sess. 68.

In 1944, at the request of the War Department, Congress amended § 401 (g) of the 1940 Act into the form in which it was when applied to the petitioner; this amendment required that a dismissal or dishonorable discharge result from the conviction for desertion before expatriation should follow and provided that restoration of a deserter to active duty during wartime should have the effect of restoring his citizenship. 58 Stat. 4. It is abundantly clear from the debate and reports that the

---

[2] The precise meaning of this phrase has never been clear, see Roche, The Loss of American Nationality—The Development of Statutory Expatriation, 99 U. of Pa. L. Rev. 25, 61–62. It appears, however, that the State Department regarded it to mean loss of citizenship, see, *e. g.,* Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, 76th Cong., 1st Sess. 38.

sole purpose of this change was to permit persons convicted of desertion to regain their citizenship and continue serving in the armed forces, H. R. Rep. No. 302, 78th Cong., 1st Sess. 1; S. Rep. No. 382, 78th Cong., 1st Sess. 1; 89 Cong. Rec. 10135.  Because it was thought unreasonable to require persons who were still in the service to fight and, perhaps, die for the country when they were no longer citizens, the requirement of dismissal or dishonorable discharge prior to denationalization was included in the amendment.   See S. Rep. No. 382, *supra*, at 3; 89 Cong. Rec. 3241.

Petitioner advances two possible constructions of § 401 (g) that would exclude him from its operation and avoid constitutional determinations.   It is suggested that the provision applies only to desertion to the enemy and that the sentence of a dishonorable discharge, without the imposition of which a conviction for desertion does not have an expatriating effect, must have resulted from a conviction solely for desertion.   There is no support for the first of these constructions in a fair reading of § 401 (g) or in its congressional history.   Rigorously as we are admonished to avoid consideration of constitutional issues if statutory disposition is available, it would do violence to what this statute compellingly conveys to draw from it a meaning other than what it spontaneously reveals.

Section 401 (g) imposes expatriation on an individual for desertion "provided he is convicted thereof by court martial and as the result of such conviction is dismissed or dishonorably discharged from the service of such military or naval forces . . . ."   Petitioner's argument is that the dishonorable discharge must be *solely* "the result of such conviction" and that § 401 (g) is therefore not applicable to him, convicted as he was of escape from confinement and absence without leave in addition to desertion.   Since the invariable practice in military trials

is and has been that related offenses are tried together with but a single sentence to cover all convictions, see *Jackson* v. *Taylor,* 353 U. S. 569, 574, the effect of the suggested construction would be to force a break with the historic process of military law for which Congress has not in the remotest way given warrant. The obvious purpose of the 1944 amendment, requiring dishonorable discharge as a condition precedent to expatriation, was to correct the situation in which an individual who had been convicted of desertion, and who had thus lost his citizenship, was kept on duty to fight and sometimes die "for his country which disowns him." Letter from Secretary of War to Chairman, Senate Military Affairs Committee, S. Rep. No. 382, 78th Cong., 1st Sess. 3. There is not a hint in the congressional history that the requirement of discharge was intended to make expatriation depend on the seriousness of the desertion, as measured by the sentence imposed. If we are to give effect to the purpose of Congress in making a conviction for wartime desertion result in loss of citizenship, we must hold that the dishonorable discharge, in order for expatriation to follow, need only be "the result of" conviction for one or more offenses among which one must be wartime desertion.

Since none of petitioner's nonconstitutional grounds for reversal can be sustained, his claim of unconstitutionality must be faced. What is always basic when the power of Congress to enact legislation is challenged is the appropriate approach to judicial review of congressional legislation. All power is, in Madison's phrase, "of an encroaching nature." Federalist, No. 48 (Earle ed. 1937), at 321. Judicial power is not immune against this human weakness. It also must be on guard against encroaching beyond its proper bounds, and not the less so since the only restraint upon it is self-restraint. When the power of Congress to pass a statute is challenged, the function

of this Court is to determine whether legislative action lies clearly outside the constitutional grant of power to which it has been, or may fairly be, referred.  In making this determination, the Court sits in judgment on the action of a co-ordinate branch of the Government while keeping unto itself—as it must under our constitutional system—the final determination of its own power to act.  No wonder such a function is deemed "the gravest and most delicate duty that this Court is called on to perform." Holmes, J., in *Blodgett* v. *Holden,* 275 U. S. 142, 148 (separate opinion).  This is not a lip-serving platitude.

Rigorous observance of the difference between limits of power and wise exercise of power—between questions of authority and questions of prudence—requires the most alert appreciation of this decisive but subtle relationship of two concepts that too easily coalesce.  No less does it require a disciplined will to adhere to the difference.  It is not easy to stand aloof and allow want of wisdom to prevail, to disregard one's own strongly held view of what is wise in the conduct of affairs.  But it is not the business of this Court to pronounce policy.  It must observe a fastidious regard for limitations on its own power, and this precludes the Court's giving effect to its own notions of what is wise or politic.  That self-restraint is of the essence in the observance of the judicial oath, for the Constitution has not authorized the judges to sit in judgment on the wisdom of what Congress and the Executive Branch do.

One of the principal purposes in establishing the Constitution was to "provide for the common defence."  To that end the States granted to Congress the several powers of Article I, Section 8, clauses 11 to 14 and 18, compendiously described as the "war power."  Although these specific grants of power do not specifically enumerate every factor relevant to the power to conduct war, there is no limitation upon it (other than what the Due Process

Clause commands). The scope of the war power has been defined by Chief Justice Hughes in *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426: "[T]he war power of the Federal Government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme cooperative effort to preserve the nation." See also Chief Justice Stone's opinion in *Hirabayashi* v. *United States,* 320 U. S. 81, 93.

Probably the most important governmental action contemplated by the war power is the building up and maintenance of an armed force for the common defense. Just as Congress may be convinced of the necessity for conscription for the effective conduct of war, *Selective Draft Law Cases,* 245 U. S. 366, Congress may justifiably be of the view that stern measures—what to some may seem overly stern—are needed in order that control may be had over evasions of military duty when the armed forces are committed to the Nation's defense, and that the deleterious effects of those evasions may be kept to the minimum. Clearly Congress may deal severely with the problem of desertion from the armed forces in wartime; it is equally clear—from the face of the legislation and from the circumstances in which it was passed—that Congress was calling upon its war powers when it made such desertion an act of expatriation. Cf. Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 647.

Possession by an American citizen of the rights and privileges that constitute citizenship imposes correlative obligations, of which the most indispensable may well be "to take his place in the ranks of the army of his country and risk the chance of being shot down in its defense," *Jacobson* v. *Massachusetts,* 197 U. S. 11, 29. Harsh as this may sound, it is no more so than the actualities to which it responds. Can it be said that there is no

rational nexus between refusal to perform this ultimate duty of American citizenship and legislative withdrawal of that citizenship? Congress may well have thought that making loss of citizenship a consequence of wartime desertion would affect the ability of the military authorities to control the forces with which they were expected to fight and win a major world conflict. It is not for us to deny that Congress might reasonably have believed the morale and fighting efficiency of our troops would be impaired if our soldiers knew that their fellows who had abandoned them in their time of greatest need were to remain in the communion of our citizens.

Petitioner urges that imposing loss of citizenship as a "punishment" for wartime desertion is a violation of both the Due Process Clause of the Fifth Amendment and the Eighth Amendment. His objections are that there is no notice of expatriation as a consequence of desertion in the provision defining that offense, that loss of citizenship as a "punishment" is unconstitutionally disproportionate to the offense of desertion and that loss of citizenship constitutes "cruel and unusual punishment."

The provision of the Articles of War under which petitioner was convicted for desertion, Art. 58, Articles of War, 41 Stat. 787, 800, does not mention the fact that one convicted of that offense in wartime should suffer the loss of his citizenship. It may be that stating all of the consequences of conduct in the statutory provision making it an offense is a desideratum in the administration of criminal justice; that can scarcely be said—nor does petitioner contend that it ever has been said—to be a constitutional requirement. It is not for us to require Congress to list in one statutory section not only the ordinary penal consequences of engaging in activities therein prohibited but also the collateral disabilities that follow, by operation of law, from a conviction thereof duly result-

ing from a proceeding conducted in accordance with all of the relevant constitutional safeguards.[3]

Of course an individual should be apprised of the consequences of his actions. The Articles of War put petitioner on notice that desertion was an offense and that, when committed in wartime, it was punishable by death. Art. 58, *supra.* Expatriation automatically followed by command of the Nationality Act of 1940, a duly promulgated Act of Congress. The War Department appears to have made every effort to inform individual soldiers of the gravity of the consequences of desertion; its Circular No. 273 of 1942 pointed out that convictions for desertion were punishable by death and would result in "forfeiture of the rights of citizenship," and it instructed unit commanders to "explain carefully to all

---

[3] It should be noted that a person cannot be deprived of his citizenship merely on the basis of an administrative finding that he deserted in wartime or even with finality on the sole basis of his having been dishonorably discharged as a result of a conviction for wartime desertion. Section 503 of the Nationality Act of 1940 provides:

"If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. . . ." 54 Stat. 1137, 1171, now § 360 of the Immigration and Nationality Act of 1952, 66 Stat. 163, 273, 8 U. S. C. § 1503. In such a proceeding it is open to a person who, like petitioner, is alleged to have been expatriated under § 401 (g) of the 1940 Act to show, for example, that the court-martial was without jurisdiction (including observance of the requirements of due process) or that the individual, by his restoration to active duty after conviction and discharge, regained his citizenship under the terms of the proviso in § 401 (g), *supra.*

personnel of their commands [certain Articles of War, including Art. 58] . . . and emphasize the serious consequences which may result from their violation." Compilation of War Department General Orders, Bulletins, and Circulars (Government Printing Office 1943) 343. That Congress must define in the rubric of the substantive crime all the consequences of conduct it has made a grave offense and that it cannot provide for a collateral consequence, stern as it may be, by explicit pronouncement in another place on the statute books is a claim that hardly rises to the dignity of a constitutional requirement.

Petitioner contends that loss of citizenship is an unconstitutionally disproportionate "punishment" for desertion and that it constitutes "cruel and unusual punishment" within the scope of the Eighth Amendment. Loss of citizenship entails undoubtedly severe—and in particular situations even tragic—consequences. Divestment of citizenship by the Government has been characterized, in the context of denaturalization, as "more serious than a taking of one's property, or the imposition of a fine or other penalty." *Schneiderman* v. *United States,* 320 U. S. 118, 122. However, like denaturalization, see *Klapprott* v. *United States,* 335 U. S. 601, 612, expatriation under the Nationality Act of 1940 is not "punishment" in any valid constitutional sense. Cf. *Fong Yue Ting* v. *United States,* 149 U. S. 698, 730. Simply because denationalization was attached by Congress as a consequence of conduct that it had elsewhere made unlawful, it does not follow that denationalization is a "punishment," any more than it can be said that loss of civil rights as a result of conviction for a felony, see Gathings, Loss of Citizenship and Civil Rights for Conviction of Crime, 43 Am. Pol. Sci. Rev. 1228, 1233, is a "punishment" for any legally significant purposes. The process of denationalization, as devised by the expert Cabinet Committee on which Congress quite properly

and responsibly relied[4] and as established by Congress in the legislation before the Court,[5] was related to the authority of Congress, pursuant to its constitutional powers, to regulate conduct free from restrictions that pertain to legislation in the field technically described as criminal justice. Since there are legislative ends within the scope of Congress' war power that are wholly consistent with a "non-penal" purpose to regulate the military forces, and since there is nothing on the face of this legislation or in its history to indicate that Congress had a contrary purpose, there is no warrant for this Court's labeling the disability imposed by § 401 (g) as a "punishment."

Even assuming, *arguendo,* that § 401 (g) can be said to impose "punishment," to insist that denationalization is "cruel and unusual" punishment is to stretch that concept beyond the breaking point. It seems scarcely arguable that loss of citizenship is within the Eighth Amendment's prohibition because disproportionate to an offense that is capital and has been so from the first year of Independence. Art. 58, *supra;* § 6, Art. 1, Articles of War of 1776, 5 J. Cont. Cong. (Ford ed. 1906) 792. Is constitutional dialectic so empty of reason that it can be seriously urged that loss of citizenship is a fate worse than death? The seriousness of abandoning one's country when it is in the grip of mortal conflict precludes denial

---

[4] The report of that Committee stated that the provision in question "technically is not a penal law." Codification of the Nationality Laws of the United States, *supra,* at 68. In their letter to the President covering the report, the Committee stated that none of the loss of nationality provisions was "designed to be punitive . . . ." *Id.,* at VII.

[5] There is no basis for finding that the Congress that enacted this provision regarded it otherwise than as part of the clearly nonpenal scheme of "acts of expatriation" represented by § 401 of the Nationality Act of 1940, *supra.*

to Congress of the power to terminate citizenship here, unless that power is to be denied to Congress under any circumstance.

Many civilized nations impose loss of citizenship for indulgence in designated prohibited activities. See, generally, Laws Concerning Nationality, U. N. Doc. No. ST/LEG/SER.B/4 (1954). Although these provisions are often, but not always, applicable only to naturalized citizens, they are more nearly comparable to our expatriation law than to our denaturalization law.[6] Some countries have made wartime desertion result in loss of citizenship—native-born or naturalized. *E. g.,* § 1 (6), Philippine Commonwealth Act No. 63 of Oct. 21, 1936, as amended by Republic Act No. 106 of June 2, 1947, U. N. Doc., *supra,* at 379; see Borchard, Diplomatic Protection of Citizens Abroad, 730. In this country, desertion has been punishable by loss of at least the "rights of citizenship"[7] since 1865. The Court today reaffirms its decisions (*Mackenzie* v. *Hare,* 239 U. S. 299; *Savorgnan* v. *United States,* 338 U. S. 491) sustaining the power of Congress to denationalize citizens who had no desire or intention to give up their citizenship. If loss of citizenship may constitutionally be made the consequence of such conduct as marrying a foreigner, and thus certainly not "cruel and unusual," it seems more than incongruous that such loss should be thought "cruel and unusual" when it is the consequence of conduct that is also a crime. In short, denationalization, when attached to the offense

---

[6] In the United States, denaturalization is based exclusively on the theory that the individual obtained his citizenship by fraud, see *Luria* v. *United States,* 231 U. S. 9, 24; the laws of many countries making naturalized citizens subject to expatriation for grounds not applicable to natural-born citizens do not relate those grounds to the actual naturalization process. *E. g.,* British Nationality Act, 1948, 11 & 12 Geo. VI, c. 56, § 20 (3).

[7] See note 2, *supra.*

of wartime desertion, cannot justifiably be deemed so at variance with enlightened concepts of "humane justice," see *Weems* v. *United States,* 217 U. S. 349, 378, as to be beyond the power of Congress, because constituting a "cruel and unusual" punishment within the meaning of the Eighth Amendment.

Nor has Congress fallen afoul of that prohibition because a person's post-denationalization status has elements of unpredictability. Presumably a denationalized person becomes an alien *vis-à-vis* the United States. The very substantial rights and privileges that the alien in this country enjoys under the federal and state constitutions puts him in a very different condition from that of an outlaw in fifteenth-century England. He need not be in constant fear lest some dire and unforeseen fate be imposed on him by arbitrary governmental action— certainly not "while this Court sits" (Holmes, J., dissenting in *Panhandle Oil Co.* v. *Mississippi ex rel. Knox,* 277 U. S. 218, 223). The multitudinous decisions of this Court protective of the rights of aliens bear weighty testimony. And the assumption that brutal treatment is the inevitable lot of denationalized persons found in other countries is a slender basis on which to strike down an Act of Congress otherwise amply sustainable.

It misguides popular understanding of the judicial function and of the limited power of this Court in our democracy to suggest that by not invalidating an Act of Congress we would endanger the necessary subordination of the military to civil authority. This case, no doubt, derives from the consequence of a court-martial. But we are sitting in judgment not on the military but on Congress. The military merely carried out a responsibility with which they were charged by Congress. Should the armed forces have ceased discharging wartime deserters because Congress attached the consequence it did to their performance of that responsibility?

This legislation is the result of an exercise by Congress of the legislative power vested in it by the Constitution and of an exercise by the President of his constitutional power in approving a bill and thereby making it "a law." To sustain it is to respect the actions of the two branches of our Government directly responsive to the will of the people and empowered under the Constitution to determine the wisdom of legislation. The awesome power of this Court to invalidate such legislation, because in practice it is bounded only by our own prudence in discerning the limits of the Court's constitutional function, must be exercised with the utmost restraint. Mr. Justice Holmes, one of the profoundest thinkers who ever sat on this Court, expressed the conviction that "I do not think the United States would come to an end if we lost our power to declare an Act of Congress void. I do think the Union would be imperiled if we could not make that declaration as to the laws of the several States." Holmes, Speeches, 102. He did not, of course, deny that the power existed to strike down congressional legislation, nor did he shrink from its exercise. But the whole of his work during his thirty years of service on this Court should be a constant reminder that the power to invalidate legislation must not be exercised as if, either in constitutional theory or in the art of government, it stood as the sole bulwark against unwisdom or excesses of the moment.