Lucy Peters Deleon GUERRERO, Plaintiff,

v.

UNITED STATES of America, Government of the Trust Territory, Edwin Meese, Herman Marcuse, Nancy Finn, and Edward N. Hart, Defendants.

Civ. No. 88–0010.

United States District Court, Northern Mariana Islands.

July 26, 1988.

Larry Hillblom, C/O O'Connor & Sorensen, Susupe, Saipan, MP, for plaintiff.

D. Paul Vernier, Asst. U.S. Atty., Agana, Guam, for defendant.

LAURETA, District Judge.

On April 26, 1988, plaintiff Lucy Peters Deleon Guerrero filed a complaint for declaratory and injunctive relief and mandamus seeking citizenship and a passport. She alleged that the United States breached the United Nations Charter Trusteeship by refusing to grant her citizenship and a passport. On June 8, 1988, Guerrero filed a motion for a temporary restraining order requesting that the Court order the United States to issue her a Trust Territory or United States passport within ten days. The United States appeared for the motion on the temporary restraining order on June 9, 1988. The hearing on the record was brief, during which the United States requested that the Court "continue" the hearing on the temporary restraining order and convene in chambers to discuss the matter. In essence, the discussion in chambers which followed amounted to an assurance by the Assistant United States Attorney that the administrative process to resolve the passport question had been initiated

and that plaintiff would be receiving her passport forthwith.

On July 19, 1988, at a chamber's conference and later on the record in Court, it was revealed that the United States had up until that time failed to grant Guerrero citizenship and issue her a passport but instead desired to issue her a limited passport for travel purposes. Plaintiff's counsel then requested that the Court rule on the motion for a temporary restraining order. The Court deems that this is the only provident course and this decision and order will serve that purpose.

A brief review of the pertinent facts is necessary to put this suit in context. In 1947, the United Nations appointed the United States to serve as trustee of the Trust Territory of the Pacific Islands following the close of World War II. As trustee, the United States was the administering authority of the Trust Territory. The objectives of the Trust Territory system were, inter alia, to:

1. Further international peace and security,

2. Promote the advancement of the people,

3. Foster the development of independent government, and

4. Encourage the advancement of human rights and fundamental freedoms. Article 76, United Nations Charter.

Commensurate with these obligations the United States established the Trust Territory Government, which served throughout Micronesia from 1947 and continues still in Palau. The Trust Territory Government issued Trust Territory passports to Micronesians who qualified as Trust Territory citizens. Guerrero renounced her British citizenship in order to comply with the Trust Territory regulations and was given a Trust Territory passport.

In 1976, the United States and the Commonwealth of the Northern Mariana Islands entered into a Covenant[1] in which

1. *Covenant to Establish a Commonwealth of the*     *Northern Mariana Islands in Political Union*

the parties agreed to political unity. The Covenant provided that certain citizens would, upon the effective date, become United States citizens. With citizenship came the right to acquire a United States passport.

In November, 1986, President Ronald Reagan, by proclamation, effectively terminated the trusteeship over the Northern Mariana Islands. The termination triggered the activation of § 301 and vested in those qualified citizens United States citizenship and the right to obtain a United States passport. The events which followed the termination of the trusteeship are the impetus for the filing of this suit.

Following the proclamation, numerous individuals living in the Commonwealth filled out and submitted applications to obtain passports. But in some cases the applications were denied by the United States passport office. At the same time that these individuals were being denied United States passports their Trust Territory passports were expiring. The result has been extremely unfortunate. The individuals were stripped of citizenship. In addition to being rendered stateless, they were stranded in the Commonwealth, for it is impossible to leave the Northern Mariana Islands without a passport. In many cases, as in the case herein, they had previously renounced their allegiance to another country in order to obtain Trust Territory citizenship and were left with no recourse but to hope that the United States, which during this period has granted citizenship to millions of illegal aliens, would reconsider and fulfill its obligation to grant citizenship to people who were entitled to it.

Putative citizens were forced to begin filing lawsuits to obtain citizenship. The first lawsuit was a class-action in which an individual named Camacho–Bowie, representing a class of similarly situated individuals who were under eighteen years of age and born to one parent who was a United States citizen, sought citizenship. These individuals were granted citizenship in a neutrally-worded order in that case which merely stated that Camacho–Bowie and in-

dividuals similarly situated to him were entitled to citizenship.

The United States, and it is spoken of as a single entity herein, subsequently refused to issue passports to numerous other individuals purportedly because they did not fit within the strictures of § 301. Nine lawsuits followed, all of which are pending before the Court at this time. Though each involves a different plaintiff or plaintiffs and some, in addition to suing the United States, have sued the Commonwealth, all seek the same goal—citizenship and a passport. The United States has participated in untold meetings, hearings, discussions, etc. and, basically, has asked the Court and the parties to be "reasonable" and to be "patient". A theme that has carried throughout these discussions is that due to the many government agencies involved and the various functionaries in those agencies it was difficult to arrive at a consensus of opinion as to who was entitled to citizenship under § 301. The United States continually assured the Court that all of the plaintiffs' concerns would be addressed in a negotiated settlement which the United States espoused as the most provident course. The Court, in retrospect, perhaps unwisely, concurred with the many requests of the United States and deferred ruling with hopes that the matter could be resolved amicably and expeditiously.

On July 19, 1988, more than 40 days after plaintiff Guerrero had moved for a temporary restraining order, which was held in abeyance pending the inter-agency resolution by the United States, the matter was still not settled. The United States offered that, in lieu of citizenship and a passport, it would provide plaintiff Guerrero with "travel documents" if she would submit another application. The United States has grossly missed the mark.

"Travel documents" are not the issue here. It is something much greater. The effect of the United States' interpretation of § 301 of the Covenant is that the Presidential Proclamation of 1986 stripped these plaintiffs of all citizenship. They became

*with the United States of America,* P.L. 94–241.

stateless persons. The proclamation terminated the Trust Territory. The Covenant anticipated that these individuals would become United States citizens. They are no longer Trust Territory citizens because that entity no longer exists in the Commonwealth. The United States' refusal to recognize them as United States citizens leaves them stateless. (Guerrero, whose husband is a sitting senator, may be unable to vote in the upcoming election).

■ Citizenship is in itself a fundamental right. *Trop v. Dulles,* 356 U.S. 86, 93, 78 S.Ct. 590, 594, 2 L.Ed.2d 630 (1958). To remove it so capriciously and so callously and then to request that the stateless plaintiffs be reasonable and patient while the United States resolves its inter-agency squabbles is contemptible. Though perhaps each individual does not place the same value on citizenship no one would argue that citizenship itself does not have an inherent value. Over two hundred years of American history demonstrates the price some have paid to preserve it.

The Court is guided not only by its own sentiments concerning citizenship but also by those of the United States Supreme Court expressed in *Trop v. Dulles,* cited supra. In *Trop,* the Court was faced with a federal statute that empowered the government to strip military personnel of citizenship as punishment for desertion followed by dishonorable discharge. Trop was expatriated under this provision and sought a declaratory judgment that he was a citizen. Trop argued that expatriation as a punishment for desertion was cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

It is interesting and instructive to note that not only did the Court address the expatriation consequences of the desertion statute it also addressed whether the death penalty, also available as a punishment for desertion, violated the Eighth Amendment.

The Court concluded that the penalty of death for deserting was not cruel and unusual punishment as that term had been defined. But, on the issue of whether stripping an individual's citizenship for deserting violated the same provision, the Court ruled that it did. The Court's discussion of the issue is most informative.

We believe ... that use of denationalization as a punishment is barred by the Eighth Amendment. There may be no physical mistreatment, no primitive torture. There is instead the total destruction of the individual's status in organized society. It is a form of punishment more primitive than torture for it destroys for the individual the existence that was centuries in the development. The punishment strips the citizen of his status in the national and international political community. His very existence is at the sufferance of the country in which he happens to find himself. While any one country may accord him some rights, and presumably as long as he remained in this country he would enjoy the limited rights of an alien, no country need do so because he is stateless. Furthermore, his enjoyment of even the limited rights of an alien might be subject to termination at any time by reason of deportation. In short, the expatriate has lost his right to have rights.

This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated. He may be subject to banishment, a fate universally decried by civilized people. He is stateless, a condition deplored in the international community of democracies. It is no answer to suggest that all disastrous consequences of his fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious.

The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime.... In this country the Eighth Amendment forbids this to be done. *Id.*

With these principles in mind the Court now looks to the propriety of plaintiff's motion. The test in the Ninth Circuit for determining whether to grant a temporary restraining order was recently enunciated in *Chalk v. United States District Court for the Central District of California*, 840 F.2d 701, 704 (9th Cir.1988); *citing, inter alia, Los Angeles Memorial Coliseum Comm'n v. National Football League*, 634 F.2d 1197, 1200 (9th Cir.1980). To prevail, the moving party must demonstrate either:

1. A combination of probable success on the merits and the possibility of irreparable injury, or

2. That serious questions are raised and the balance of hardships tips sharply in its favor. *Chalk*, 840 F.2d at 704.

Under either test plaintiff would prevail. It is most probable that after proceeding on the merits of this suit plaintiff would be deemed entitled to citizenship and a passport. The denial of citizenship as well as the right to travel constitute irreparable injury.

Under the alternative test the Court again concludes that plaintiff has met her burden. The denial of citizenship and the right to travel raise serious questions. Further, the hardship the United States will face in issuing plaintiff a passport is miniscule compared with the harm plaintiff suffers being stateless and without the right to leave the Commonwealth.

It is for these reasons that plaintiff's motion for a temporary restraining order is GRANTED.

The United States has FIVE working days to process plaintiff's previously submitted application and to deliver to her a United States passport.

IT IS SO ORDERED.