WILKEN, District Judge,
dissenting:
Appellants, enrolled members of the Pechanga Tribe since birth, filed a petition for a writ of habeas corpus under the Indian Civil Rights Act (ICRA) asserting that their Tribal Council violated the due process, equal protection, free speech and cruel and unusual punishment clauses of the Act when it stripped them of membership in the Tribe. The membership criteria that the Tribal Council applied were *922 not established until 1979; the procedures it used to disenroll Tribal members were not established until 1988; and the Tribal Council did not begin disenrolling large numbers of members until recently, when the Tribe’s casino profits became a major source of revenue.[1] Appellants allege that they are victims of the Tribal Council’s greed associated with these casinos.
The majority concludes that the district court properly dismissed Appellants’ petition for lack of subject matter jurisdiction because Appellants (1) were not detained and (2) did not exhaust their Tribal remedies. I respectfully dissent and address each argument in turn.
I. Indian Civil Rights Act (ICRA)
Beginning in 1961, through hearings and surveys, Congress commenced an investigation into the conduct of tribal governments due to abuses that some tribal members were enduring at the hands of tribal officials. In 1968, Congress enacted ICRA to protect against such abuses by imposing restrictions upon tribal governments similar to those contained in the Bill of Rights and the Fourteenth Amendment. The enforcement mechanism Congress provided was that of habeas corpus in federal courts. The statute at issue, 25 U.S.C. § 1303, provides, “The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe.” A central purpose of ICRA was to “ ‘secur[e] for the American Indian the broad constitutional rights afforded to other Americans,’ and thereby to ‘protect individual Indians from arbitrary and unjust actions of tribal governments.’ ” Santa Clara Pueblo v. Martinez, 436 U.S. 49, 61, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (quoting S.Rep. No. 841, 90th Cong., 1st Sess., 5-6 (1967)).
A. Detention
“Detention” by order of an Indian tribe is the sole jurisdictional prerequisite for federal habeas review. The requirement in § 1303 that an individual be “detained” is akin to the “in custody” and “detention” requirement in other habeas statutes. Poodry v. Tonawanda Band of Seneca Indians, 85 F.3d 874, 891 (2d Cir.1996), cert. denied, 519 U.S. 1041, 117 S.Ct. 610, 136 L.Ed.2d 535 (1996) (“Congress appears to use the terms ‘detention’ and ‘custody’ interchangeably in the habeas context.”). The habeas statutes analogous to § 1303 refer to “detention” as well as “in custody” throughout. See 28 U.S.C. §§ 2242, 2243, 2245, 2249, 2253 and 2255. “There is no reason to conclude that the requirement of ‘detention’ set forth in the Indian Civil Rights Act § 1303 is any more lenient than the requirement of ‘custody’ set forth in the other federal habeas statutes.” Moore v. Nelson, 270 F.3d 789, 791 (9th Cir.2001). Nor is there any reason to conclude that the requirement of “detention” in § 1303 is any more strict than the requirement of “custody” or “detention” in the other federal habeas statutes.
The custody or detention requirement may be met if the habeas petitioner is not physically confined. Jones v. Cunningham, 371 U.S. 236, 239-40, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963); see Dow v. Court of the First Circuit Through Huddy, 995 F.2d 922, 923 (9th Cir.1993) (per curiam) (holding that a requirement to attend fourteen hours of alcohol rehabilitation constituted custody; requiring petitioner’s physical presence at a particular place “significantly restrain[ed][his] liberty to do *923 those things which free persons in the United States are entitled to do”), cert. denied, 510 U.S. 1110, 114 S.Ct. 1051, 127 L.Ed.2d 372 (1994).
The detention requirement is designed to limit the availability of habeas review “to cases of special urgency, leaving more conventional remedies for cases in which the restraints on liberty are neither severe nor immediate.” Hensley v. Mun. Court, 411 U.S. 345, 351, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). Therefore, the inquiry into whether a petitioner has satisfied the jurisdictional prerequisite for habeas review requires a court to judge the “severity” of an actual or potential restraint on liberty.
The combination of the current and potential restrictions placed upon Appellants and the loss of their life-long Pechanga citizenship constitute a severe restraint on their liberty. The majority analyzes each of these grounds separately, instead of collectively, and determines that none amounts to a detention. I respectfully disagree with this approach.
When Tribal members are disenrolled, they become “nonmembers” of the Tribe and lose all rights associated with being a Pechanga citizen. One of those rights is access to the Pechanga Reservation. The Pechanga Non-Member Reservation Access and Rental Ordinance (Reservation Access Ordinance) states, “The custom, tradition and practice of the Pechanga Band has always been, and remains, that the Pechanga Reservation is closed to nonmembers. Access to and residency within the Pechanga Reservation is a privilege which may be granted or denied to an individual upon proper authority of the Pechanga Band.”
Elsewhere, the Reservation Access Ordinance provides, “Use by non-members of roads within the Pechanga Reservation is ... by permission of the Tribal Council and is subject to revocation at any time and for any reason.” The Ordinance establishes that a non-member may enter the Pechanga Reservation only upon invitation by the Tribal Council or by an enrolled member of the Pechanga Band. Otherwise, access to the Pechanga Reservation by non-members is prohibited.
Since being disenrolled, Appellants have been excluded from the school, the health clinic and the senior citizens’ facilities on the Reservation. Some of the Appellants live on the Reservation. Although they may enter the Reservation and travel to their homes, any Tribal Ranger can take away that liberty at any moment.
Pechanga Tribal Rangers have the authority and discretion summarily to exclude non-members from the Pechanga Reservation for up to seven days for any of the following reasons:
(1) suspicion that a non-member has committed a violation of any applicable tribal, state or federal law within the Pechanga Reservation;
(2) suspicion that a non-member is a danger to himself, herself or others;
(3) a finding by a Tribal Ranger that a non-member is a public nuisance; or
(4) any behavior which is suspicious or not consistent with a legitimate visit either to a tribal enterprise for business or patronage purposes, or to the home of a resident of the Pechanga Indian Reservation by invitation and in compliance with the Non-Member Reservation Access and Rental Ordinance.
Thus, a parent could, without warning, be barred from going home for a week by a Tribal Ranger who observes “any behavior that is suspicious.” That Appellants have not been removed thus far does not render them free or unrestrained. Appellants may currently be able to “come and go” as they please, cf. Hensley, 411 U.S. *924 at 351, 93 S.Ct. 1571, but their current status as non-members living on the Pechanga Reservation means that at any point they may be compelled to “go,” and be no longer welcome to “come.” That is a severe restraint to which the members of the Pechanga Band are not generally subject. See id.
The majority analogizes the severe restraint Appellants confront with that in a case involving a twenty-five dollar fine. Edmunds v. Won Bae Chang, 509 F.2d 39, 41 (9th Cir.1975). In that case, the court held that Edmunds was not subjected to a severe restraint because there was “no provision in the sentence for his confinement in the case of non-payment.” Id. The court generally observed that “a threat of incarceration is implicit in any court-imposed fine, for jail is one of the sanctions by which courts enforce their judgments and orders.” However, in the circumstances of Edmunds, “confinement [was] no more than a speculative possibility — ‘the unfolding of events may render the entire controversy academic.’ ” Id. (quoting Hensley, 411 U.S. at 352, 93 S.Ct. 1571). Analogizing the current and potential penalties involved in this case with a twenty-five dollar fine and the speculative possibility that failure to pay the fine may result in judicial proceedings leading to confinement trivializes the severity of Appellants’ situation.
Furthermore, Appellants have been stripped of their life-long Pechanga citizenship, which by itself constitutes a severe deprivation. A deprivation of citizenship is “an extraordinarily severe penalty” with consequences that “may be more grave than consequences that flow from conviction for crimes.” Klapprott v. United States, 335 U.S. 601, 611-12, 69 S.Ct. 384, 93 L.Ed. 266 (1949). The Supreme Court has found the penalty of denationalization of a natural-born citizen, sought to be imposed after conviction for military desertion, to be unconstitutional. See Trop v. Dulles, 356 U.S. 86, 104, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958).
It is a form of punishment more primitive than torture, for it destroys for the individual the political existence that was centuries in the development.
This punishment is offensive to cardinal principles for which the Constitution stands. It subjects the individual to a fate of ever-increasing fear and distress. He knows not what discriminations may be established against him, what proscriptions may be directed against him, and when and for what cause his existence in his native land may be terminated. He may be subject to banishment, a fate universally decried by civilized people.... It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious.
Id. at 101-102, 78 S.Ct. 590. A “deprivation of citizenship does more than merely restrict one’s freedom to go or remain where others have the right to be: it often works a destruction of one’s social, cultural, and political existence.” Poodry, 85 F.3d at 897. Although with disenrollment Appellants retain their United States citizenship and will not be physically stateless, they have been stripped of their lifelong citizenship and identity as Pechangans. This is more than just a loss of a label, it is a loss of a political, ethnic, racial and social association. William C. Canby, Jr., American Indian Law in a Nut Shell §§ III.B-C (5th ed.2009); Felix S. Cohen, Handbook of Federal Indian Law § 3.03 (2005). Such a loss constitutes a restraint on liberty that, combined with the actual and potential restraints described above, *925 satisfies the detention requirement under § 1303, in my opinion.
The majority, in dicta, implies that we may not hear Appellants’ ICRA claims because we generally do not have jurisdiction to review tribal membership decisions. Here, Appellants are not directly challenging the merits of their disenrollment, i.e. whether they are direct descendants from the original Pechanga Temecula people. Rather, Appellants challenge under ICRA the manner of their disenrollment. The former would be barred by tribal sovereign immunity, whereas the latter is not.
B. Exhaustion
The majority concludes that we lack jurisdiction over any claims for exclusion or eviction because Appellants have not exhausted their Tribal remedies for such claims or demonstrated that exhaustion would be futile. But Appellants are not asserting jurisdiction based on any exclusion or eviction from the Pechanga Reservation. Rather, Appellants’ claim of jurisdiction is based on the restraints on their liberty arising from being disenrolled and threatened with exclusion. Notably, the parties agree that Appellants have completed the internal Tribal appeal process for challenging disenrollment. Further, there does not appear to be any remedy available to Appellants if they were to be given a seven-day exclusion without warning. Appellants have exhausted their claims and their habeas petition is ripe for adjudication.
II. Conclusion
When viewed together, the act of stripping Appellants’ Tribal citizenship and the current and potential restrictions placed upon Appellants constitute a severe restraint on their liberty. Therefore, Appellants have been detained within the meaning of § 1303. Accordingly, I would reverse and remand to the district court to hear their petition for a writ of habeas corpus on its merits.

. At the time of Appellants' disenrollment, every adult Pechangan received a per capita benefit of over $250,000 per year.