MARTIN, Circuit Judge,
dissenting:
I write separately to express several objections to the Majority’s denial of Mr. Henry’s application to file a second or successive habeas petition pursuant to 28 U.S.C. § 2244(b)(2)(A).
I.
As a preliminary matter, I do not think it prudent to decide a complicated retroac-tivity issue under the pressure of Mr. Henry’s imminent execution when it appears unnecessary to do so for his case; In In re Holladay, 331 F.3d 1169, 1172-73 (11th Cir.2003), this Court held that in order to make a prima facie showing sufficient to support the filing of a second or successive habeas petition under 28 U.S.C. § 2244(b)(2)(A), the habeas petitioner must satisfy two requirements. First, the petitioner must satisfy the statutory requirement that “the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.” Id. at 1172 (quoting 28 U.S.C. § 2244(b)(2)(A)). Second, the petitioner *1164 must also show that “there is a reasonable likelihood” he is entitled to relief under the new rule. Id. at 1173. Here, even assuming the rule in Hall v. Florida, — U.S. —, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), is retroactive, the Majority holds it “still could not authorize the filing of a second or successive habeas petition because Henry has not made a sufficient showing of possible merit to warrant a further exploration by the district court.” Maj. Op. at 1161 (quotation marks omitted).
In light of the Majority’s conclusion that Mr. Henry cannot prevail in any event, it is simply not necessary for the Court to resolve this retroactivity issue. Indeed, judicial restraint counsels against resolving the important retroactivity issue without the benefit of full briefing. The Florida Supreme Court did not express an opinion on retroactivity in deciding Mr. Henry’s case. Neither has the State of Florida, to my knowledge, argued in this Court that the rule is not retroactive. In fact, the State has filed no response to Mr. Henry’s application. Further, the retroactivity issue is one of first impression that has not been addressed by any Court, state or federal, since the Supreme Court only decided Hall about three weeks ago. I would not decide it here.
II.
Judicial modesty is uniquely appropriate here also because the Majority’s conclusion that the Supreme Court intended its rule in Hall to apply prospectively only and not to cases on collateral review is doubtful for several reasons. First, the Majority ignores the fact that Hall was decided in the collateral review context. Second, the Majority overlooks the substantive nature of the rule announced in Hall and treats it as merely procedural. Third, the Majority errs by concluding that “no combination of Supreme Court holdings compels the conclusion that Hall is retroactive to cases on collateral review.” Maj. Op. at 1161.
A.
The Majority fails to take into consideration the important procedural context of the Supreme Court’s decision in Hall. It is important to keep in mind that the United States Supreme Court in Hall was reviewing a decision of the Florida Supreme Court denying collateral relief long after the defendant’s case became final on direct review.[1] To. the extent that Hall an *1165 nounced a new rule of constitutional criminal procedure, the fact that the Supreme Court was reviewing a collateral proceeding supports the conclusion that the Justices intended their holding in Hall to apply retroactively to all cases on collateral review. Before discussing retroactivity, though, I pause to express my doubts about whether the rule announced in Hall is even a “new rule” within the meaning of Teague v. Lane, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) — the Supreme Court’s seminal decision on the ret-roactivity of new rules of constitutional criminal procedure to cases on collateral review.
The Majority says that Hall did announce a new rule. Maj. Op. at 1158-59. But the Supreme Court has taught us that “[i]t is admittedly often difficult to determine when a case announces a new rule.” Teague, 489 U.S. at 301, 109 S.Ct. at 1070. “In general ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.” Id. “To put it differently, a case announces a new rule if the result was not dictated by precedent existing at the time of the defendant’s conviction became final.” Id. Section C of the Supreme Court’s Hall decision states that Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) “itself acknowledges the inherent error in IQ testing.” Hall, 134 S.Ct. at 1998. While the Supreme Court acknowledged “that Atkins did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation falls within the protection of the Eighth Amendment,” id. (quotation marks omitted), it noted that Atkins itself “twice cited definitions of intellectual disability which, by their express terms, rejected a strict IQ test score cutoff at 70,” id. It occurs to me, therefore, that the decision in Hall did not announce a new rule insofar as the result was dictated by Atkins.
By the same token, if Atkins is retroactively applicable to cases on collateral review — and that conclusion is beyond any debate — then the Supreme Court’s decision in Hall must also apply retroactively, to the extent it merely represents an application or clarification of the Atkins decision. If Hall did not announce a “new rule of constitutional law,” Mr. Henry does not meet the statutory criteria for filing a second or successive habeas corpus petition under § 2244(b)(2)(A). But the rule in Hall would apply retroactively to habeas petitioners in collateral review proceedings other than those seeking authorization to file second or successive habeas corpus petitions. Which brings me back to why the procedural context of Mr. Henry’s case supports the conclusion the rule announced in Hall applies retroactively.
After Atkins was decided, the Florida Supreme Court adopted Florida Rule of Criminal Procedure 3.203 as a mechanism for determining whether a defendant’s intellectual disability barred imposition of the death penalty. See Amendments to Florida Rules of Criminal Procedure and Florida Rules of Appellate Procedure, 875 So.2d 563 (Fla.2004). Rule 3.203(d)(4)(F) as originally adopted specifically provided that prisoners in Mr. Hall’s procedural posture could file a successive motion for collateral relief in state court to assert an Atkins claim:
If a death sentenced prisoner has filed a motion for postconviction relief, the motion has been ruled on by the circuit *1166 court, and that ruling is final on or before October 1, 2004, the prisoner may raise a claim under this rule in a successive rule 3.851 motion filed within 60 days after October 1, 2004. The circuit court may reduce this time period and expedite the proceedings if the circuit court determines that such action is necessary.
Id. at 571. Mr. Hall availed himself of this procedure by timely filing a successive postconviction motion. His postconviction motion was denied after an evidentiary hearing. Mr. Hall then appealed the denial of relief to the Florida Supreme Court arguing, among other things, “that his IQ should be read as a range of scores from 67 to 75 and th[e] [Florida Supreme] Court’s adoption of a firm cutoff of 70 or below to qualify as mentally retarded misapplies the Supreme Court’s ruling in Atkins.” Hall v. State, 109 So.3d 704, 707 (Fla.2012). The state court rejected his argument and affirmed the denial of relief. Id. at 707-08, 711. It was in this context, undeniably collateral review, that the United States Supreme Court held that Florida’s “rigid rule ... creates an unacceptable risk that persons with intellectual disability will be executed, and thus is unconstitutional.” Hall, 134 S.Ct. at 1990.
The postconviction context of the Court’s decision in Hall tells us that, at a minimum, the Supreme Court intended its holding to apply retroactively to all cases on collateral review. We are all familiar with the Supreme Court’s holding in Teag-ue that “[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced.” [2] 489 U.S. at 310, 109 S.Ct. at 1075. In Teague, a federal habeas petitioner urged the adoption of a new rule in his case: that the Sixth Amendment’s fair cross section requirement applies to the petit jury.[3] Id. at 299, 109 S.Ct. at 1069. Because the Court held that the new rule urged by the “petitioner should not be applied retroactively to cases on collateral review, [the Court] decline[d] to address [his] contention.” Id. In doing so, the Court explained that “were [it] to recognize the new rule urged by petitioner in this case, [it] would have to give petitioner the benefit of that new rule even though it would not be applied retroactively to other similarly situated.” Id. at 315, 109 S.Ct. at 1078. To avoid treating similarly situated defendants differently, the Court adopted what it called “a more principled way of dealing with the [retroactivity] problem” in the collateral review context. Id. at 316, 109 S.Ct. at 1078. It will “simply refuse to announce a new rule in a given case unless the rule would be applied retroactively to the defendant in the case and to all others similarly situated.” Id. Consistent with this policy, we have noted the Supreme Court “rarely, if ever, announces and retroactively applies new rules of constitutional criminal procedure in the postconviction context.” In re Perez, 682 F.3d 930, 933 (11th Cir.2012) (per curiam). It stands to reason then, to the extent the *1167 Supreme Court did announce a new rule in Hall, it intended for that rule to apply retroactively to all persons on collateral review. After all, the Supreme Court applied the new rule to Mr. Hall, a prisoner whose case became final long before Atkins was decided. Hall, 134 S.Ct. at 2001. It would be passing strange, and contrary to everything the Supreme Court has told us about retroactivity, if the rule in Hall only applied to Mr. Hall’s collateral review proceedings and not to other defendants’ collateral review proceedings. Hall’s case is currently on remand to the Florida Supreme Court.
B.
There is another reason the rule announced in Hall should be applied retroactively to all cases on collateral review. That is because the rule is more substantive than procedural. When a decision of th[e] [Supreme] Court results in a ‘new rule,’ that rule applies to all criminal cases still pending on direct review,” but “[a]s to convictions that are already final, however, the rule applies only in limited circumstances.” Summerlin, 542 U.S. at 351, 124 S.Ct. at 2522. One of those exceptions is that “[n]ew substantive rules generally apply retroactively.” Id. The Supreme Court has taught us that “[a] rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes.” Id. at 353, 124 S.Ct. at 2523. “In contrast, rules that regulate only the manner of determining the defendant’s culpability are procedural.” Id. My consideration of the Supreme Court’s distinction between substantive and procedural rules in Summerlin persuades me that Hall is substantive because “it alters ... the class of persons that the law punishes.” Before Hall, capital defendants with IQ scores above 70 in Florida could not be considered intellectually disabled. After Hall, defendants with IQ scores above 70 may be considered intellectually disabled under Atkins. And as Atkins held, persons with intellectual disability may not be executed. Atkins, 536 U.S. at 321, 122 S.Ct. at 2252. Hall is substantive because it grew the class of people who are- not eligible for the death penalty. The Hall opinion did not merely address the procedural method for determining who is intellectually disabled.
Indeed, Hall could not have been more clear that Florida’s substantive requirement of an IQ test score of 70 or less “creates an unacceptable risk that persons with intellectual disabilities will be executed, and thus is unconstitutional.” Hall, 134 S.Ct. at 1990. This reason is significant in light of the Supreme Court’s explanation in Summerlin for why substantive rules apply retroactively: “[s]uch rules apply retroactively because they necessarily carry a significant risk that a defendant ... faces a punishment that the law cannot impose upon him.” 542 U.S. at 352, 124 S.Ct. at 2522-23 (quotation marks omitted) (emphasis added). It follows that the rule in Hall is substantive and applies retroactively because it addresses a “significant risk that a defendant ... faces a punishment that the law cannot impose upon him.” Id. It is undeniable that the Court’s holding in Hall invalidated part of Florida’s substantive definition for intellectual disability. In doing so, the Supreme Court expanded the definition of intellectual disability and along with it the class of defendants who are not eligible to be executed under Atkins.
C.
The Supreme Court certainly did not expressly say anything in Hall about whether its holding was retroactive. The word retroactive never even appears in the opinion. But the rules do not require the Court to say anything about retroac-tivity in order for its rule to apply retroac *1168 tively to cases on collateral review for the purposes of § 2244(b)(2)(A). Justice O’Connor explained “more fully the circumstances in which a new rule is made retroactive to cases on collateral review by the Supreme Court” for the purposes of § 2244(b)(2)(A). Tyler v. Cain, 533 U.S. 656, 668, 121 S.Ct. 2478, 2485, 150 L.Ed.2d 632 (2001) (O’Connor, J., concurring) (quotation marks omitted). In Tyler, Justice O’Connor said:
It is only through the holdings of this Court, as opposed to this Court’s dicta and as opposed to the decisions of any other court, that a new rule is “made retroactive ... by the Supreme Court” within the meaning of § 2244(b)(2)(A). The clearest instance ... in which we can be said to have “made” a new rule retroactive is where we expressly have held the new rule to be retroactive in a case on collateral review and applied the rule to that case. But, as the Court recognizes, a single case that expressly holds a rule to be retroactive is not a sine qua non for the satisfaction of this statutory provision. This Court instead may “ma[k]e” a new rule retroactive through multiple holdings that logically dictate the retroactivity of the new rule. To apply the syllogistic relationship described by Justice BREYER, if we hold in Case One that a particular type of rule applies retroactively to cases on collateral review and hold in Case Two that a given rule is of that particular type, then it necessarily follows that the given rule applies retroactively to cases on collateral review. In such circumstances, we can be said to have “made” the given rule retroactive to cases on collateral review.
Tyler, 533 U.S. at 668-69, 121 S.Ct. at 2485-86 (citations omitted). The Majority acknowledges Justice O’Connor’s concurring opinion in Tyler on this subject. See Maj. Op. at 1160. However, I believe the Majority has moved too quickly, in the span of less than three weeks, to conclude that “no combination of Supreme Court holdings compels the conclusion that Hall is retroactive to cases on collateral review.” Maj. Op. at 1161.
And there is more. Justice O’Connor has taught us that “[i]t is relatively easy to demonstrate the required logical relationship [for automatic retroactivity] with respect to the first exception articulated in Teague.” Tyler, 533 U.S. at 669, 121 S.Ct. at 2486. Under Teague’s first exception, “a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.” Id. (quotation marks omitted). Thus, “[w]hen the [Supreme] Court holds as a new rule in a subsequent case that a particular species of primary, private individual conduct is beyond the power of the criminal lawmaking authority to proscribe, it necessarily follows that th[e] [Supreme] Court has ‘made’ that new rule retroactive to cases on collateral review.” Id. But it is important to understand how Teague’s first exception applies in the context of the death penalty in order to understand that the first exception also means Hall applies retroactively.
In Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), abrograted on other grounds by Atkins, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335, the Supreme Court recognized that “a new rule placing a certain class of individuals beyond the State’s power to punish by death is analogous to a new rule placing certain conduct beyond the State’s power to punish at all.” Id. at 330, 109 S.Ct. at 2953. Said another way, Penry held “the first exception set forth in Teague should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class *1169 of defendants because of their status or offense.” Id. Under this broadened understanding of Teague’s first exception, Penry explained that if the Supreme Court “held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity and would be applicable to defendants on collateral review.” Id. Indeed, the Majority recognizes that the holdings in Penry and Atkins, when taken together, leave “no question that the new constitutional rule abstractly described in Penry and formally articulated in Atkins is retroactively applicable to cases on collateral review.” Maj. Op. at 1160 (quoting In re Holladay, 331 F.3d 1169, 1172 (11th Cir.2003)). But the Majority stops short of finding that Hall is retroactive because it says “there are no Supreme Court cases ... that necessarily dictate that the Hall rule is retroactive.” Id. The Penry principle does not apply here, the Majority explains, “because Hall merely provides new procedures for ensuring that States do not execute the intellectually disabled.” Id. at 1161. I part ways with the Majority on this point.
One problem with the Majority’s analysis is that it ignores the substantive nature of the Court’s ruling in Hall. Again, Hall modified Florida’s substantive definition for determining intellectual disability, not just its procedures. This much is clear from Hall itself: “The question this case presents is how intellectual disability must be defined in order to implement these principles and the holding of Atkins.” Hall, 134 S.Ct. at 1993 (emphasis added). One of the principles the Justices were referring to was the Eighth Amendment principle that persons with intellectual disability may be tried and punished, but “[tjhey may not, however, receive the law’s most severe sentence.” Id. The “Eighth and Fourteenth Amendments to the Constitution ■ forbid the execution of persons with intellectual disability.” Id. at 1990.
Just as Atkins can only be understood as a substantive limitation on the power of the state to take a life, so too is Hall’s substantive limitation on the power of the state to define who is mentally retarded. Before Hall, Florida law defined intellectual disability with a strict IQ cutoff of 70 or below, regardless of the existence of deficits in adaptive functioning. After Hall, Florida must consider a range of IQ scores along with deficits in adaptive functioning and evidence of developmental onset. The reason for the Supreme Court’s intervention bears repeating: application of Florida’s “rigid rule ... creates an unacceptable risk that persons with intellectual disability will be executed.” Hall, 134 S.Ct. at 1990.
III.
Moving on from my questions about the correctness and propriety of the Majority’s holding on the issue of retroactivity, I must also address the merits of Mr. Henry’s case. Both the Florida Supreme Court and the Majority of this panel rely on a recent report that was prepared by a panel of experts selected by the Governor of Florida to asses Mr. Henry’s fitness to be executed pursuant to § 922.07 of the Florida Statutes. See Henry v. State, No. SC14-1053, slip. op. at 4-7, 141 So.3d 557, 2014 WL 2609114 (Fla. June 12, 2014); Maj. Op. at 1154, 1155-56, 1162. Section 922.07 provides procedures to be followed “[wjhen the Governor is informed that a person under sentence of death may be insane.” Fla. Stat. § 922.07(1). Thus, when the Governor is so informed, the Governor appoints a commission of three psychiatrists “to examine the convicted person to determine whether he or she understands the nature and effect of the death penalty and why it is to be imposed upon him or her.” Id. This statute ad *1170 dresses a question quite different from that of intellectual disability. Compare Panetti v. Quarterman, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), and Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986), with Hall, 134 S.Ct. 1986, and Atkins, 536 U.S. 304, 122 S.Ct. 2242. Florida Statute § 922.07(1) is designed to aid in the determination of whether the defendant is competent to be executed. See generally Ford, 477 U.S. at 410, 106 S.Ct. at 2602 (“The Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane.”). Nonetheless, in order to support its conclusion that Mr. Henry is not intellectually disabled, the Majority relies, in part, on the findings of those whose task was limited to a determination of Mr. Henry’s competency to be executed. See, e.g., Maj. Op. at 1163 (“psychiatrists unanimously concluded that Henry suffered from no intellectual disability as defined in DSM-5”).[4]
I find the Florida Supreme Court’s consideration of the Governor’s competency-to-be-executed experts’ findings and conclusions to be troubling for another reason as well. Mr. Henry’s motion for determination of intellectual disability, filed well before Hall was decided, was summarily denied by the state trial court without any evidentiary hearing. Mr. Henry therefore was not provided an opportunity to test the reliability of the Governor’s experts’ opinions about his intellectual disabilities. Thus, the experts’ findings and conclusions with respect to Mr. Henry’s intellectual disability have never been subjected to the crucible of adversarial testing. In this way, Mr. Henry was not able to participate in the truthseeking process for this question. This raises well established due process concerns. See Grannis v. Ordean, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914) (“The fundamental requisite of due process of law is the opportunity to be heard.”).
Finally, I view the merits of Mr. Henry’s intellectual disability claim differently than the Majority. Based on the limited record before us, I cannot say there is no reasonable likelihood that Mr. Henry would benefit from the Supreme Court’s decision in Hall. Hall teaches us that Florida, by operation of its bright line IQ score of 70, created “an unacceptable risk that persons with intellectual disability will be executed” in violation of the Eighth Amendment. Hall, 134 S.Ct. at 1990.[5] Before Hall, Mr. *1171 Henry had no Atkins claim under Florida law, regardless of any deficits in adaptive functioning or developmental onset he might have been able to show. Florida courts would not have considered such evidence because his IQ score is above 70. See Hall, 134 S.Ct. at 1994 (citing Cherry v. State, 959 So.2d 702, 713-14 (Fla.2007)). And before Atkins was decided in 2002, federal law did not bar the execution of intellectually disabled prisoners. Indeed, before Atkins, the conventional wisdom was that “reliance on mental retardation as a mitigating factor can be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury.” Atkins, 536 U.S. at 321, 122 S.Ct. at 2252. Thus, I am reluctant to draw any adverse inferences from the fact Mr. Henry has not previously asserted that he was intellectually disabled.
At the same time, the evidence now before this Court that Mr. Henry is intellectually disabled is undeveloped. Mr. Henry alleges that he is intellectually disabled but he does not support his application with affidavits from experts or other evidence saying that he is intellectually disabled. Indeed, the only IQ score he has presented is a 78, from the mid-1980s. But in the unique circumstances presented by this case, it is not reasonable to expect so much from him given the Supreme Court’s recent conclusion that Florida’s definition for determining intellectual disability was unconstitutional. Governor Scott signed Mr. Henry’s death warrant on May 2, 2014, at which time his execution was scheduled for Wednesday, June 18, 1014. As the Majority explains, the Florida Supreme Court promptly issued a briefing schedule setting a deadline of May 19, 2014 for the completion of all proceedings in the state trial court. Mr. Henry’s counsel opted not to file anything and instead requested the Governor to make a determination about Mr. Henry’s fitness under § 922.07 of the Florida Statutes. The panel of experts selected by the Governor conducted a 170-minute clinical evaluation of Mr. Henry at the Florida State Prison and then issued a report on May 16, 2014, in which they opined Mr. Henry was competent to be executed. On May 20, 2014, the Governor issued an executive order lifting the temporary stay of execution he had entered pursuant to § 922.07. Seven days later, the United States Supreme Court decided Hall on May 27.
Just three days later defense counsel filed a motion for determination of intellectual disability in the state trial court as a bar to Mr. Henry’s execution. The state trial court summarily denied Mr. Henry’s motion without an evidentiary hearing because it was filed outside the Florida Supreme Court’s scheduling order. Mr. Henry promptly appealed the denial to the Florida Supreme Court and asked them to reverse and remand for an evidentiary hearing to determine his intellectual disability based on Hall. On June 12, 2014, the Florida Supreme Court considered the merits of Mr. Henry’s intellectual disability claim and denied his request for an evidentiary hearing. See Henry, No. SC14-1053, 141 So.3d at 559-61, 2014 WL 2609114 at *2-4.
Two days later, Mr. Henry filed the application to file the second or successive habeas corpus petition based on Hall now before us. See Emergency Motion for Leave to File Second or Successive Petition for Writ of Habeas Corpus and Request for Stay of Execution, In re: John Ruthell Henry, No. 14-12623, 757 F.3d 1151, 2014 WL 2748288 (11th Cir. June 14, 2014) (App.). Mr. Henry’s application asserts that he is intellectually disabled and cannot be executed. App. at 4. He asserts that he has not previously been examined by an expert for the purpose of determining his intellectual disability. App. at 7. In *1172 support of his intellectual disability claim, Mr. Henry alleges the following:
At the time of trial, Mr. Henry had a low intelligence and an IQ of 78. He has not had an IQ test since 1986. Mr. Henry also has poor adaptive functioning and social adjustment. Dr. Mosman testified that this began as a result of post-concussion syndrome and traumatic brain injury sustained during a severely abusive childhood, which led to cognitive deficits. Mr. Henry lacks the capacity to translate his clinical IQ to real life situations due to a lack of understanding of basic social customs, poor abstract reasoning and logical thinking skills, and poor comprehension. He functions with a mental/developmental age of 13 or 14, equivalent to a person with an IQ of 70. Substance abuse exacerbated the poor level of functioning. Mr. Henry also suffered from delusions and hallucinations as early as age 10 that further hindered his adaptive functioning.
App. at 9. While these allegations do not clearly establish that Mr. Henry is intellectually disabled, they offer a basis finding that he is. Given the unique procedural posture of this case, the timing of the Supreme Court’s intervening decision in Hall, and the fact that Mr. Henry asserts he has never had an evaluation by any expert to determine his intellectual disability, I cannot say there is no reasonable likelihood he could prove he is intellectually disabled under Hall.
On this record, I would grant Mr. Henry’s request to file a second or successive habeas petition because I believe he should have one full and fair opportunity to litigate his intellectual disability claim.[6] In doing so, I am mindful that all we need to decide in this type of proceeding is whether Mr. Henry has made “a sufficient showing of possible merit to warrant a fuller exploration by the district court.” In re Holladay, 331 F.3d at 1173 (quotation marks omitted). Although this standard is not toothless, it is not a particularly high standard. Id. at 1174 (citing Bell v. United States, 296 F.3d 127, 128 (2d Cir.2002) (“A prima facie showing is not a particularly high standard. An application need only show sufficient likelihood of satisfying the strict standards of § 2255[h] [which are the same standards that apply to state habeas petitioners] to warrant a fuller exploration by the district court.” (footnote and quotation marks omitted))).
Given the Eighth Amendment’s categorical bar against executing the intellectually disabled, and Mr. Henry’s colorable showing that he may be intellectually disabled, he should have at least one opportunity to determine his intellectual disability under Hall. Cf. Johnson v. Mississippi 486 U.S. 578, 584, 108 S.Ct. 1981, 1986, 100 L.Ed.2d 575 (1988) (“The fundamental respect for *1173 humanity underlying the Eighth Amendment’s prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case.” (quotation marks omitted)). “By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons.” Roper v. Simmons, 543 U.S. 551, 560, 125 S.Ct. 1183, 1190, 161 L.Ed.2d 1 (2005); see also Trop v. Dulles, 356 U.S. 86, 100, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958) (plurality opinion) (“The basic concept underlying the Eighth Amendment is nothing less than the dignity of man”). To facilitate Mr. Henry having this opportunity to develop his intellectual disability claim, I would grant a stay of execution so he can litigate this claim in the District Court.

. The petitioner in Hall committed his crimes on February 21, 1978. Hall, 134 S.Ct. at 1990. His conviction and sentence were affirmed on direct appeal by the Florida Supreme Court on July 16, 1981. Hall v. State, 403 So.2d 1321 (Fla.1981) (per curiam). Mr. Hall subsequently filed a state postconviction motion that was denied by the state trial court, and the Supreme Court of Florida affirmed. Hall v. State, 420 So.2d 872 (Fla.1982) (per curiam). He then sought and was eventually denied federal habeas corpus relief in 1986. See Hall v. Wainwright, 805 F.2d 945 (11th Cir.1986) (per curiam). However, Mr. Hall later filed a second motion for state postconviction relief which led the Florida Supreme Court to rule that he had been subjected to a. Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), error. Hall v. State, 541 So.2d 1125, 1128 (Fla.1989) (per curiam). On resentencing Mr. Hall was again sentenced to death and his death sentence was affirmed by the Florida Supreme Court in 1993. Hall v. State, 614 So.2d 473 (Fla.1993) (per curiam). His direct appeal then became final on October 4, 1993, when the United States Supreme Court denied his petition for writ of certiorari. Hall v. Florida, 510 U.S. 834, 114 S.Ct. 109, 126 L.Ed.2d 74 (1993); see also Clay v. United States, 537 U.S. 522, 527, 123 S.Ct. 1072, 1076, 155 L.Ed.2d 88 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.”). Mr. Hall then sought state postconviction relief in the state trial court which was denied, and the Florida Supreme Court affirmed this denial of relief in 1999. Hall v. State, 742 So.2d 225 (Fla. *1165 1999) (per curiam). The Florida Supreme Court also denied his habeas corpus petition, Hall v. Moore, 792 So.2d 447 (Fla.2001) (per curiam), and the Supreme Court denied cer-tiorari in February 2002, Hall v. Moore, 534 U.S. 1136, 122 S.Ct. 1082, 151 L.Ed.2d 982 (2002).

. I read the Supreme Court's decision in Hall as being more substantive than procedural because it expands the class of persons who are categorically ineligible for the death penalty. This is another reason the Hall decision applies retroactively on collateral review. "New substantive rules generally apply retroactively.” Schriro v. Summerlin, 542 U.S. 348, 351, 124 S.Ct. 2519, 2522, 159 L.Ed.2d 442 (2004).

. In Taylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the Supreme Court expressly held that the Sixth Amendment's fair cross section requirement does not apply to the petit jury. Id. at 538, 95 S.Ct. at 701. Nonetheless, the petitioner in Teague contended "that the ratio decidendi of Taylor cannot be limited to the jury venire, and he urge[d] the adoption of a new rule.” Teague, 489 U.S. at 299, 109 S.Ct. at 1069.

. In any event, any opinion expressed by the Governor's panel of doctors would have been rendered consistent with then — existing Florida law. Thus, any prior evaluation-such as those of Governor’s panel contained in their written report to the Governor on May 16, 2014 — would have been under a legal standard that has since been ruled unconstitutional in Hall.

. Yet another distinction between my reading of Hall and that of the Majority is the Majority’s seeming insistence that Mr. Henry can make a prima facie claim of mental disability only if he shows an IQ score of less than 75. Maj. Op. at 1162. While it is true Hall held that state courts must now consider the five point standard error of measure in assessing intellectual disability, Hall also recognized that "[(Intellectual disability is a condition, not a number." Hall, 134 S.Ct. at 2001. I worry the Majority is establishing a new bright line cut off which fails to heed the Supreme Court's admonishment in Hall that "[c]ourts must recognize ... that the IQ test is imprecise.” Id. I do not suggest that IQ scores are not helpful. They are. "But in using [IQ] scores to assess a defendant’s eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do....” Id. That said, although Mr. Henry’s 78 IQ score would produce a range of 73 to 83 when the standard error of measure is taken into account, he has also asserted in state court pleadings that his extensive mental health history and known deficits in adaptive functioning result in a level of functioning comparable to individuals with an IQ of less than 70. This is a qualifying score.

. I emphasize that it is not for me as appellate judge to determine at this juncture whether Mr. Henry is actually intellectually disabled. Rather, I am simply saying, as this Court did in In re Holladay, that in my view, "based on the facts presented and the procedural posture of this case petitioner should be permitted to file a second petition for a writ of habeas corpus on the basis of his [Hall] claim.” 331 F.3d at 1176. I understand the District Court would then have to decide for itself, with the benefit of full briefing and other appropriate procedures, whether Mr. Henry is entitled to relief. See Jordan v. Sec'y, Dep’t of Corr., 485 F.3d 1351, 1357 (11th Cir.2007) (holding that after this Court grants a petitioner authorization to file a second or successive habeas petition under 28 U.S.C. § 2244(b)(3)(A), the district court must "determine for itself whether [the statutory] requirements are met”); id. at 1358 ("The statute puts on the district court the duty to make the initial decision about whether the petitioner meets the § 2244(b) requirements — not whether he has made out a prima facie case for meeting them, but whether he actually meets them.”).